**Edward C. CELLA, II, Plaintiff–Appellee and Cross–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellant and Cross–Appellee.**

Nos. 92–1826, 92–1842.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 16, 1993.

Decided June 23, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 6, 1993.*

---

* The Honorable Kenneth F. Ripple took no part in the consideration of this petition.

Dennis H. Geisleman, Myers & Geisleman, Fort Wayne, IN and Terry A. Bell (argued), Belle Chasse, LA, for Edward C. Cella, II, Plaintiff.

John F. Hoehner, U.S. Atty., Office of the U.S. Atty., Dyer, IN; David H. Miller, Asst. U.S. Atty., Office of the U.S. Atty.; Thomas M. Moorhead (argued), Douglas Dormire Powers, Baker & Daniels, Fort Wayne, IN; David V. Hutchinson, Dept. of Justice, Torts Branch, Civ. Div., Washington, DC; and Cary Wiener, Kirlin, Campbell & Keating, New York City, for the U.S. defendant.

Before BAUER, Chief Judge, FLAUM, Circuit Judge, and WILL, Senior District Judge.[**]

WILL, Senior District Judge.

This case involves an appeal by defendant United States from the district court's judgment finding liability based on negligence under the Jones Act, 46 U.S.C.App. § 688, and awarding damages in the amount of $858,654.00 to plaintiff Edward C. Cella, II. Plaintiff Cella also cross-appeals from the district court's determination of damages. According to the defendant, "[t]his appeal presents an opportunity to forestall the 'junk science' litigation in this circuit." Appellant's Br. at 9. Because we regard that as a mischaracterization of this case and for the reasons stated below, we respectfully decline the defendant's invitation and affirm the ruling of the district court.

## I.

### BACKGROUND

In April 1987, plaintiff Edward C. Cella, II was hired through the Seafarers International Union to work aboard the U.S.N.S. Hess ("Hess"), a Navy vessel, for thirty days as the chief cook in the steward's department. Although Cella was fit for duty at the time that he boarded the Hess, he suffered four separate incidents of physical injury during the trip: (1) Cella injured his lower back during the downloading of approximately four pallets of stores from the dock onto the ship; (2) Cella burned his hand when he lifted a twenty-quart pot filled with spaghetti sauce and the simmering sauce spilled onto his hand (because the pot's handle was coated with melted butter); (3) Cella struck his head twice and fell on his buttocks when the vessel under her own power broke the mooring lines tied to the dock; and (4) Cella injured his lumbar spine while lifting approximately ninety pounds of pot roast out of the oven after other crew members refused to help him.

Cella did not seek professional medical treatment for certain of these injuries and treated himself for others. Following the fourth incident, however, Cella claimed that he experienced excruciating pain throughout his body and was confined to the ship's sick bay until the end of the trip.

In addition to these incidents of physical injury, Cella also experienced emotional stress arising out of racial tensions on the Hess and received from other crew members threats of physical violence. For example, certain black members of the crew refused to take orders from Cella, called him names, refused generally to cooperate with him, allegedly burglarized his room, and repeatedly threatened his life.

Upon disembarkment from the Hess in May 1987, Cella consulted several doctors regarding his chronic back pain and fatigue, then returned home to Fort Wayne, and was eventually referred to Dr. Louis Romain, a licensed medical physician who had specialized in neurology since 1971. After taking a complete medical history of the plaintiff, Dr. Romain performed a full neurological examination, conducted a series of tests to rule out various possible diagnoses, and directed two muscle biopsies to be taken and sent out for laboratory analysis. Repeated testing revealed that certain of Cella's muscle enzymes were greatly elevated. The biopsy results suggested that the plaintiff suffered from focal chronic interstitial myositis. After reviewing these test results in light of his examination and history of Cella, Dr. Romain became convinced that Cella suffered from an inflammatory process of the muscles, a type of myositis involving both the upper and lower extremities—that is, polymyositis.[1]

Although Dr. Romain recognized that the generally-accepted medical dogma identifies polymyositis as an idiopathic disorder, he had heard of cases of polymyositis being secondary to trauma and believed that Cella's polymyositis-like condition might have been

**\*\*** The Honorable Hubert L. Will, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. As the district court noted, the testimony of Dr. Romain employs the terms "polymyositis," "in-

flammatory disorder of the muscle," and "polymyositis-like disease or condition" interchangeably. For simplicity, we acknowledge the multiple terminology utilized by Dr. Romain and refer in this opinion to Cella's condition as "polymyositis" or "polymyositis-like."

brought on by the events that occurred aboard the Hess. To test his theory, Dr. Romain conducted an extensive search of medical literature to ascertain whether there were documented cases that would support his belief that Cella's disorder was caused by the trauma and stress to which the plaintiff was subjected while aboard the Hess.

From the medical literature search, Dr. Romain concluded first, that cases of polymyositis are heterogenous in origin; and second, that among the documented cases there was always a consistent but somewhat low percentage of cases in which some type of severe emotional or physical stress seemed to have etiological importance.[2] Dr. Romain further believed that an experimental model with marathon runners which revealed a link between physical stress and elevated enzymes supported his conclusion that physical stress and trauma caused Cella's polymyositis condition.[3]

In addition to citing the occasional incidence of trauma, the medical literature considered by Dr. Romain addressed genetic factors, viral infections, vaccinations, certain tropical diseases, and systemic lupus erythematosus as other possible causes of polymyositis. However, through his physical examination of the plaintiff, extensive neurological testing of the plaintiff, and careful review of

the plaintiff's medical history, Dr. Romain was able to exclude each of these factors as the potential cause of Cella's condition. Through his elimination of these other possible causes and his medical literature research revealing a causal relation between trauma and documented polymyositis cases, Dr. Romain concluded that the plaintiff's polymyositis-like condition was caused by the trauma arising from the events aboard the Hess. He prescribed prednisone treatment and physical therapy, which apparently stabilized the plaintiff's condition.

Plaintiff Cella then brought this action against defendants for damages for personal injuries under 28 U.S.C. § 1333, under the Jones Act, 46 U.S.C.App. § 688, under the Suits in Admiralty Act, 46 U.S.C.App. § 741, *et seq.*, and under general maritime law. At trial, Dr. Romain testified that it was his opinion within a reasonable degree of medical certainty that Cella's polymyositis-like condition was caused by the trauma and physical stress that he experienced while aboard the Hess. 9/11/90 Tr. at 36–37, 75. The medical literature relied upon by Dr. Romain to establish the causal connection between trauma and polymyositis was entered into evidence. Several other medical experts testified that polymyositis is an idiopathic disorder and that there is at this time no known definite

2. The following articles admit to the possibility that polymyositis may be caused by trauma, as Dr. Romain contends: Pl.'s Ex. 17, John N. Walton & Raymond D. Adams, *Polymyositis* 36–37 (London: 1958) (trauma cited as a precipitating factor to polymyositis; discussion of six cases of polymyositis in which there was a precipitating cause of extreme stress, physical injury, or extreme combined mental and physical stress); Pl.'s Ex. 20, W. Muller, The Fibrositis Syndrome: Diagnosis, Differential Diagnosis and Pathogenesis, Scand. J. Rheumatology (Suppl. 65): 40–53, 1987 (trauma identified as a possible cause of the manifestation of the fibrositis syndrome); Pl.'s Ex. 33, L. Chukwuma Chiedozi, Pyomyositis—Review of 205 Cases in 112 Patients, 137 The American Journal of Surgery 255–59 (Feb. 1979) (25% of patients gave a history of trauma, concluding that although trauma may be a contributing factor it is not by itself a sufficient condition for the development of pyomyositis); Def.'s Ex. AA, Paul H. Plotz et al., Current Concepts in the Idiopathic Inflammatory Myopathies: Polymyositis, Dermatomyositis, and Related Disorders, *Annals of Internal Medicine*, Vol. III, No. 2, at 143–57 (July 15, 1989) (noting the heterogeneous

nature of polymyositis cases and the possibility of environmental factors as causal agents).

3. *See* Pl.'s Ex. 18, Olof Osterman et al., Serum Carbonic Anhydrase III in Neuromuscular Disorders and in Healthy Persons after a Long Distance Run, Journal of the Neurological Sciences, 1985, 70: 347–57 (finding that enzymes are elevated during strenuous physical exercise such as a long distance run, and later returned to normal levels); Pl.'s Ex. 23, Michael J. Warhol et al., Skeletal Muscle Injury and Repair in Marathon Runners After Competition, A.J.P., Vol. 118, No. 2, at 331–39 (Feb. 1985) (concluding that elevated enzymes in marathon runners after competition may arise from injury to skeletal muscle). *See also* Pl.'s Ex. 28, Hiroshi Kosano et al., Change in Concentrations of Myogenic Components of Serum during 93 h of Strenuous Physical Exercise, Clinical Chemistry, Vol. 32, No. 2, 1986, at 346–47 (noting elevated enzymes after a 93-hour period of strenuous ranger training activity; concluding that minimal structural disintegration of muscle resulted because enzymes later returned to normal levels).

etiology of polymyositis. 9/10/90 Tr. at 188 (testimony of Dr. Pan); 9/13/90 Tr. at 186, 189 (testimony of Dr. Wissman); 9/14/90 Tr. at 8 (testimony of Dr. Kincaid). At least one of these experts, however, further acknowledged that trauma has been identified as a possible cause of polymyositis. 9/10/90 Tr. at 178 (testimony of Dr. Pan). The defendant also offered as evidence several medical articles which stated that the etiology of polymyositis is unknown.[4]

The district court reviewed all of the medical literature and expert medical testimony introduced at trial and found that "there is no inherent conflict between the general conclusions of these articles regarding the etiology of polymyositis and Dr. Romain's clinical diagnosis in this case, that plaintiff's condition was caused by the events complained of on the Hess." Memorandum Opinion and Order, 825 F.Supp. 1383, 1394 n. 19 (N.D.Ind.1991). Based on this evidence, the district court found "by a preponderance of the evidence that [Cella's] condition was, in fact, caused by the trauma and emotional stress that the plaintiff suffered aboard the Hess." Id. at 1395 (footnote omitted). The district court also noted that evidence regarding Cella's past medical history, including symptoms such as elevated enzymes in the early 1980s, clearly raised the suspicion that he may have been afflicted with polymyositis prior to the trip on the Hess. Id. at 1395 n. 20. The court nonetheless concluded that

> even if the plaintiff was afflicted with polymyositis prior to 1987, he was completely asymptomatic at the time he entered into service upon the Hess; the events complained of upon the Hess clearly aggravated plaintiff's condition, caused him to become symptomatic, and proximately caused his current condition which has deteriorated continuously since his service on the Hess.

Id.

Accordingly, the district court found that Cella's polymyositis was either caused or ag-

gravated by the actual physical injuries and threats of physical violence which he suffered aboard the Hess such that he was entitled to damages under a Jones Act theory of employer negligence. Id. at 1404–05. The court also determined that Cella was contributorily negligent in the amount of 40%, that Cella's life expectancy was reduced by 50%, that he had reached maximum recovery on February 15, 1989, so as not to be entitled to seaman's maintenance and cure, and thus awarded Cella a total of $868,654.00 in its amended judgment issued on February 12, 1992.

## II.

## ANALYSIS

The defendant United States raises three issues on appeal: whether the admission of Dr. Romain's expert opinion testimony violates Federal Rule of Evidence 703; whether the district court's findings of fact regarding medical causation are clearly erroneous; and whether the district court erred by awarding damages under the Jones Act for injuries caused by emotional stress absent either physical contact or the threat of physical harm. On cross-appeal, plaintiff Cella challenges the district court's determination of damages. Each of these issues will be examined in turn.

### A. *Admissibility of Romain Testimony*

#### 1. Standard of Review

■ The defendant first argues that the expert opinion of Dr. Romain should not have been admitted because his opinion testimony does not comply with the requirements of Federal Rule of Evidence 703. It is well established that issues related to expert opinion testimony are matters of law to be determined by the trial judge. *See, e.g., Wallace v. Mulholland,* 957 F.2d 333, 336 (7th Cir. 1992). The admission or exclusion of expert

---

4. *See, e.g.* Def.'s Ex. AA, Paul H. Plotz, Current Concepts in the Idiopathic Inflammatory Myopathies: Polymyositis, Dermatomyositis, and Related Disorders, *Annals of Internal Medicine,* Vol. III, No. 2, at 143 (July 15, 1989) ("in most cases a cause cannot yet be identified"); Def.'s Ex. BB,

Walter G. Bradley, Dermatomyositis and Polymyositis, Eugene Braunwald et al., *Harrison's Principles of Internal Medicine* at 2069 (11th ed.) ("The cause of these diseases [polymyositis and dermatomyositis] is unknown.").

testimony is thus left to the discretion of the trial judge, and his or her decision will generally not be disturbed unless it is manifestly erroneous. *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962) ("the trial judge, has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous").

■ Some courts have suggested that where the appellate court is asked to review expert opinion derived from a particular scientific technique or based on specific scientific facts, *de novo* review is appropriate. These courts reason that because the reliability of the scientific technique or process does not vary according to the circumstances of each case, it is inappropriate to view this question of reliability as a matter solely within the discretion of the trial judge. *See, e.g., Daubert v. Merrell Dow Pharmaceuticals,* 951 F.2d 1128, 1130 (9th Cir.1991), *cert. granted,* — U.S. ——, 113 S.Ct. 320, 121 L.Ed.2d 240 (1992) (*citing Reed v. State,* 283 Md. 374, 391 A.2d 364, 367 (1978)); *United States v. Williams,* 583 F.2d 1194, 1197–1201 (2d Cir.1978) (applying *de novo* review to the question of general acceptance of a scientific technique). Accordingly, we will review *de novo* the reliability of the scientific facts, data, and techniques utilized by Dr. Romain in deriving his opinion on causation while recognizing the trial judge's particular opportunity to evaluate the expert's testimony.

**5.** The rule states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
> Fed.R.Evid. 703.

**6.** *See, e.g., Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349 (6th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992) (holding that such evidence, particularly animal studies, was insufficient to allow rational jury to find that Bendectin caused plaintiff's birth defects); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 951 F.2d 1128 (9th Cir.1991), *cert.*

### 2. Federal Rule of Evidence 703

■ The pertinent inquiry under Rule 703 [5] is whether the particular facts or data relied upon by the expert in formulating the expert opinion are of a type reasonably relied upon by other experts in the field. Under this rule, expert testimony must be rejected if it lacks an adequate basis in fact. An expert witness cannot simply guess or base an opinion on surmise or conjecture. *See In re Agent Orange Prod. Liab. Litigation,* 611 F.Supp. 1223, 1244, 1248–49 (E.D.N.Y.1985), *aff'd,* 818 F.2d 187 (2d Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988). Due to the aura of reliability which often surrounds the testimony of an "expert" witness, the basis of that opinion testimony must be carefully scrutinized by the trial court judge. Moreover, courts must be particularly wary of unfounded expert opinion testimony when medical causation is the issue. As we have previously noted, "there is not much difficulty in finding a medical expert witness to testify to virtually any theory of medical causation short of the fantastic." *Stoleson v. United States,* 708 F.2d 1217, 1222 (7th Cir.1983).

The defendant argues that Dr. Romain's opinion testimony regarding the medical causation of Cella's polymyositis is inadmissible in light of the testimony of the defendant's medical experts and the abundance of medical literature stating that the etiology of polymyositis is unknown. The defendant characterizes Dr. Romain's expert testimony as a bare, unsupported conclusion without any basis in fact. Citing the Bendectin cases [6] as

*granted,* — U.S. ——, 113 S.Ct. 320, 121 L.Ed.2d 240 (1992) (holding that available animal and chemical studies and reanalysis of epidemiological studies provide insufficient foundation to allow admission under Rule 703 of expert testimony that Bendectin caused plaintiffs' injuries); *Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823 (D.C.Cir.1988), *cert. denied,* 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989) (same); *Lynch v. Merrell–National Labs.,* 830 F.2d 1190 (1st Cir.1987) (same); *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, *modified,* 884 F.2d 166 (5th Cir.1989), *cert. denied,* 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1989) (holding that such evidence was insufficient to support a jury verdict). *Cf. DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941 (3d Cir.1990) (leaving open the possibility that expert testimony based on reanalysis of epidemi-

an analogy, the defendant claims that Dr. Romain's testimony lacks an adequate foundation in scientific fact such that it is rendered inadmissible under Rule 703.

The expert testimony at issue in this case is significantly different from that proffered in the Bendectin cases. In those cases, the expert opinion testimony offered on the issue of causation was based on: (1) animal and chemical studies; and (2) reanalyses of epidemiological studies. The reanalyses which constituted the primary basis for the expert opinion in the Bendectin cases had· never been published or subjected to the rigors of peer review, and were generated solely for use in litigation. *Daubert,* 951 F.2d at 1130–31. In fact, even the experts who relied on those reanalyses for their causation opinions acknowledged the need for further verification with additional epidemiological evidence. *Id.* at 1130. Most importantly, the reanalysis methodology offered by those experts was particularly problematic in light of the massive weight of the original published epidemiological studies, which concluded that no causal connection existed. *Id.; Brock,* 874 F.2d at 312–13; *Richardson,* 857 F.2d at 831; *Lynch,* 830 F.2d at 1193–95. In short, the expert testimony in those cases was offered not only in the complete absence of critically analyzed epidemiological studies establishing a causal connection, but also in the face of directly contradictory epidemiological evidence which had been subjected to the process of peer review.

No such conflict exists in this case. Contrary to the defendant's suggestion, Dr. Romain's opinion is not inherently in conflict with the testimony of Drs. Wissman, Kincaid, and Pan, or the medical literature which describes the etiology of polymyositis as being "unknown". In fact, Dr. Romain acknowledged in his testimony at trial his awareness of the generally-accepted dogma that polymyositis is an idiopathic disorder. However, while he recognized that the cause (or causes) of polymyositis in all cases has not been definitely proven with the degree of certainty required by medical science, he also recognized that certain possible causes have been identified and studied through medical

research in this area. These theories have been published and thus subjected to peer review. In fact, some of the same articles which characterize as "unknown" the etiology of polymyositis go on to identify and discuss various possible causes, including stress and trauma. Moreover, as we shall discuss below, certain of the articles offer epidemiological support for the proposition that physical stress and trauma can cause (or aggravate) polymyositis, as Dr. Romain contends occurred in this case.

In its submissions of supplemental authorities, the defendant argues that expert medical opinion must have an epidemiological or scientific foundation. We agree. *See, e.g., Hayes v. Raytheon Co.,* 808 F.Supp. 1326 (N.D.Ill.1992); *O'Connor v. Commonwealth Edison Co.,* 807 F.Supp. 1376 (C.D.Ill.1992); *Porter v. Whitehall Laboratories, Inc.,* 791 F.Supp. 1335 (S.D.Ind.1992). Having considered carefully the medical literature offered as epidemiological support for Dr. Romain's expert opinion that Cella's polymyositis-like condition was caused, or at least made symptomatic, by trauma and physical stress, we find that the medical literature entered as evidence is adequate scientific foundation for Dr. Romain's expert opinion on causation in this case.

Plaintiff's Exhibit 15 describes generally the link between elevated enzymes, especially creatine phosphokinase (CPK), and muscle inflammation. Plaintiff's Exhibit 17 reviews many individual cases of polymyositis. In six of these case histories, the authors note a precipitating cause of extreme stress, physical injury, or extreme combined mental and physical injury. This study alone provides substantial epidemiological support for Dr. Romain's causation opinion. Plaintiff's Exhibit 18 studies the effects of the physical stress of a long distance run on the muscle and enzymes of marathon runners. The study evidences a link between physical stress and elevated enzymes. Plaintiff's Exhibit 20 identifies trauma and stress as a possible cause of the manifestation of fibrositis syndromes like polymyositis.

ological studies may be admissible where the

reliability of such studies can be proven).

Plaintiff's Exhibit 23 discusses muscle injury and repair in marathon runners and notes that several enzymes can be heightened or elevated by physical stress. Dr. Romain testified that the pathological changes in muscle fiber illustrated in the muscle biopsy photographs accompanying this article were useful to him in determining the cause of Cella's condition. 9/11/90 Tr. at 53–54. Plaintiff's Exhibit 28 demonstrates that strenuous physical exertion causes certain enzymes to elevate.

Defendant's Exhibit Z states that polymyositis is considered idiopathic because in many cases the cause of a particular patient's polymyositis cannot be determined with any reasonable degree of medical certainty. Dr. Romain explained that this article does not rebut his conclusion regarding causation in this case, but rather that it simply acknowledges the fact that the etiology of polymyositis cannot always be conclusively determined. 9/11/90 Tr. at 64. Defendant's Exhibit X notes that while there is little definitive knowledge regarding the etiology of polymyositis, this epidemiological study of 322 documented cases of polymyositis (and a related control group) revealed a link between non-routine episodic heavy exertion and polymyositis. The study concludes by noting that additional epidemiological studies of documented polymyositis cases are needed to document conclusively the various causes of polymyositis. Although the study acknowledges the need for further research, it provides further epidemiological foundation for Dr. Romain's opinion.

Dr. Romain's expert opinion regarding the cause of Cella's polymyositis-like condition in this particular case does not contradict the fact that medical science continues to categorize polymyositis as an idiopathic disorder. From our examination of the literature entered as evidence at trial, this categorization appears to derive at least in part from the relative rarity of the disorder and the heterogeneous nature of the documented cases.

This does not suggest, however, that a clinical determination of etiology in a particular case is *never* possible. Accordingly, in light of the medical literature discussed above, we find that Dr. Romain's expert testimony does not lack an adequate foundation under Rule 703.

### 3. The *Frye* Standard

■■■■ Under the *Frye* test, we must also consider whether Dr. Romain used a well-founded methodology in reaching his conclusion.[7] *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923) (methodology or technique must be "sufficiently established to have gained general acceptance in the particular field in which it belongs"); *Christophersen v. Allied–Signal Corp.*, 939 F.2d 1106, 1111 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992). *See also Ambrosini v. Labarraque*, 966 F.2d 1464 (D.C.Cir.1992); *United States v. Lundy*, 809 F.2d 392, 395 (7th Cir.1987); *Porter v. Whitehall Laboratories, Inc.*, 791 F.Supp. 1335, 1343 (S.D.Ind.1992). The *Frye* standard requires that the methodology and reasoning used by an expert in reaching a conclusion be generally accepted within the relevant scientific community. *United States v. Smith*, 869 F.2d 348, 351 (7th Cir.1989); *United States v. Tranowski*, 659 F.2d 750, 754–57 (7th Cir.1981). *See also Hayes v. Raytheon Co.*, 808 F.Supp. 1326, 1329–30 (N.D.Ill.1992) (" 'reasonably relied upon' requirement of Rule 703 ... [requires] that the expert's scientific knowledge be based on sound methodology.").

The testimony of the defendant's medical experts at trial established that in diagnosing patients with a neurological disorder such as polymyositis, treating such patients, and opining regarding causation, most physicians would require and rely upon the following information: (1) a detailed medical history; (2) a detailed neurological examination of the patient; (3) extensive laboratory studies, such as blood work and electromyography;

---

7. Some courts have criticized the *Frye* test, noting that the adoption in 1975 of the Federal Rules of Evidence casts some doubt on the continued validity of this judge-made standard. However, the Seventh Circuit has "reaffirmed the *Frye* standard subsequent to the passage of the Federal Rules of Evidence." *United States v. Carmel*, 801 F.2d 997, 998–99 (7th Cir.1986) (*citing United States v. Tranowski*, 659 F.2d 750, 755–56 (7th Cir.1981)). *See also O'Connor v. Commonwealth Edison Co.*, 807 F.Supp. 1376, 1399 (C.D.Ill.1992).

(4) muscle biopsies; and (5) medical literature research. 9/14/90 Tr. at 13–14, 18–19 (testimony of Dr. Kincaid). In treating Cella, Dr. Romain obtained and relied upon all of these facts. 9/11/90 Tr. at 7–24.

In diagnosing Cella, Dr. Romain first took a full medical history. He then conducted a complete and comprehensive neurological examination in accordance with the methodology prescribed by the Mayo Clinic. He next developed a flow chart of various possible diagnoses. Dr. Romain then conducted further testing of Cella, including two hospitalizations and additional enzyme level testing. At this point, Dr. Romain developed his preliminary diagnosis: an inflammatory disorder of the muscle akin to polymyositis. Then he caused two muscle biopsies to be taken and sent out for laboratory analysis. After his personal examination of the biopsy results, Dr. Romain began treating Cella with prednisone and physical therapy.

In arriving at a conclusion regarding the cause of Cella's condition, Dr. Romain first recalled having heard of cases of polymyositis being secondary to trauma and further recalled hearing an eloquent discussion given at a medical center on a case similar to Cella's. 9/11/90 Tr. at 24. He then conducted a world-wide search of medical literature in all languages. Dr. Romain's medical literature search sought to identify cases similar to Cella's case, in an effort to determine the cause of his condition. From the literature, he assembled a list of all possible causes. Based on Cella's medical history and extensive neurological testing, Dr. Romain eliminated all other potential causes than stress or trauma. Dr. Romain thus concluded that the physical stress and trauma to which Cella was subjected while aboard the Hess either caused or made symptomatic his polymyositis-like condition.

Although Dr. Romain's conclusion differs from those of the defendant's medical experts, he has utilized an accepted methodology in reaching his conclusion—namely, analysis of medical literature and case study comparison with the individual characteristics of the patient's case to determine etiology. Courts have observed that an expert's opinion need not be universally accepted in the scientific community before it can be sufficiently reliable to offer probative value. *Christophersen*, 939 F.2d at 1111 (*citing Osburn v. Anchor Laboratories, Inc.*, 825 F.2d 908, 915 (5th Cir.1987), *cert. denied*, 485 U.S. 1009, 108 S.Ct. 1476, 99 L.Ed.2d 705 (1988)). The *Christophersen* court noted that "[a]s long as the expert's methodology is well founded, the nature of the expert's conclusion is generally irrelevant, even if it is controversial or unique." *Id.* The methodology utilized by Dr. Romain in generating his opinion regarding causation in this case was well-founded.

In accordance with the above discussion, we conclude that the district court did not err in admitting the expert testimony of Dr. Romain.

### B. *Medical Causation*

■ The defendant also challenges the district court's findings of fact regarding the medical causation of Cella's affliction. The standard of review for this issue under Federal Rule of Civil Procedure 52(a) [8] is whether these findings are clearly erroneous. The Supreme Court has held that a factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (*citing United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)). In describing this standard, the *Anderson* Court further noted that "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it

---

8. The rule states in pertinent part:
   Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.
   Fed.R.Civ.P. 52(a).

would have weighed the evidence differently." *Id.* at 573–74, 105 S.Ct. at 1511.[9]

According to the defendant, the fact that the etiology of polymyositis is regarded by many in the medical community as being "unknown" precludes a finding as to the medical causation of the plaintiff's condition in this case. Inviting us to forestall all "junk science" litigation in this circuit, the defendant argues that causation in a particular case can *never* be proved where the complete etiology of a disease is not generally recognized and accepted. While this is undoubtedly true in a great number of cases, "never" is a powerful word—one which we choose not to invoke at this time.

As noted above, the full etiology of all polymyositis has not been proven with the degree of certainty required by medical science. Accordingly, the etiology of polymyositis is, at present, officially recognized as "unknown" by the medical community. Polymyositis is thus correctly described as an idiopathic disorder. It is also true, however, that several possible causes of the condition have been identified through scientific research in this area. In fact, many of these possible causes are documented in the medical literature submitted as evidence at the trial. As the expert medical testimony and other evidence presented at trial indicates, trauma is included among these possible causes of polymyositis.

In reaching its conclusion regarding medical causation in this case, the district court relied heavily upon the testimony of Dr. Romain. Also, the district court determined that there was no inherent conflict between the general conclusions of the medical literature regarding the etiology of polymyositis and Dr. Romain's clinical diagnosis in this case. As explained above, we agree.

Dr. Romain has diagnosed Cella as having a condition akin to polymyositis, caused by or arising from the trauma and physical stress which he experienced aboard the Hess. Though the defendant's experts may disagree, Dr. Romain's testimony does not constitute an attempt to state definitively the full etiology of polymyositis; such a statement would obviously be contrary to the state of medical science at this time. Instead, Dr. Romain merely offers a clinical diagnosis of Cella's condition and (based on his review of Cella's medical history, neurological examination of Cella, and medical literature research) an opinion regarding the cause of his condition. As explained above, this opinion regarding both diagnosis and causation is supported by the medical literature submitted as evidence at the trial.

Moreover, the testimony of the defendant's medical experts does not directly contradict Dr. Romain's testimony. The testimony of the defendant's medical experts focuses almost exclusively on the fact that the etiology of polymyositis is generally regarded as being "unknown". Only one of the defendant's experts—Dr. Kincaid—actually opined that the trauma and stress that Cella experienced aboard the Hess did not cause his current condition. 9/14/90 Tr. at 11 ("My opinion is that the trauma or stress experienced during that period did not cause his muscle disease."). During cross-examination, however, even Dr. Kincaid admitted that he could not be certain that the conditions on the Hess were not a cause at least to some small degree of Cella's condition. 9/14/90 Tr. at 29. Another of the defendant's medical experts—Dr. Wissman—acknowledged that, based on the medical literature presented at trial, he was unable to rule out trauma or physical exertion or stress as possible causes of Cella's condition. 9/13/90 Tr. at 202–3.

■ Under the Jones Act, the plaintiff's burden to prove causation is "very light" and has been described as "featherweight." *Zapata Haynie Corp. v. Arthur*, 980 F.2d 287,

---

9. The Court stated that

The standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo.*" *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969).
470 U.S. at 573–74, 105 S.Ct. at 1511.

289 (5th Cir.1992); *In re Cooper/T. Smith*, 929 F.2d 1073, 1076–77 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 190, 116 L.Ed.2d 151 (1991); *Comeaux v. T.L. James & Co.,* 702 F.2d 1023, 1024 (5th Cir.1983); *Alverez v. J. Ray McDermott & Co., Inc.,* 674 F.2d 1037, 1042 (5th Cir.1982); *Davis v. Hill Engineering, Inc.,* 549 F.2d 314, 331 (5th Cir.1977). *See also* Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 377 (2d ed. 1975). The plaintiff must merely establish that the employer's acts or omissions played some part, no matter how small, in producing the employee's injury. *Bristler v. A.W.I., Inc.,* 946 F.2d 350, 354 (5th Cir.1991) ("If the defendant's negligence played any part, however small, in producing the seaman's injury, it results in liability"); *Chisholm v. Sabine Towing & Transp. Co., Inc.,* 679 F.2d 60, 62 (5th Cir.1982); *Joyce v. Atlantic Richfield Co.,* 651 F.2d 676, 685 (10th Cir.1981) ("[I]n Jones Act cases causation may be found if the defendant's acts or omissions played any part, no matter how small, in bringing about the injury"). This standard of causation has been called the "producing cause" standard. *See, e.g., Alverez,* 674 F.2d at 1042–43.

In *Sentilles v. Inter–Caribbean Corp.,* 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959), the Supreme Court discussed what is necessary to establish medical causation under the Jones Act. In *Sentilles,* the Court reviewed the case of a seaman seeking damages under the Jones Act. As a result of turbulence on the sea, the plaintiff was pitched into the air and fell back onto the deck. Shortly thereafter, the plaintiff became ill, was hospitalized, and was treated for tuberculosis. The plaintiff's theory was that the accident aboard the ship activated or aggravated a previously latent tubercular condition. Physical examinations and x-rays of the plaintiff taken two months before the accident revealed no appearance of tuberculosis. However, a tuberculosis specialist who re-examined these x-rays following the plaintiff's hospitalization concluded in retrospect that they did in fact reveal a pulmonary lesion. Questioned hypothetically regarding the effect of an accident like the plaintiff's on the aggravation or activation of a pre-existing, dormant tubercular condition, the specialist opined that acute dissemination of the tuberculosis "might" result from the accident. Another specialist posited the trauma and plaintiff's pre-existing diabetic condition as the most likely causes of the aggravation of the tuberculosis, though he was unable to state which of the two was more likely responsible. Another medical expert opined that the accident "probably aggravated" the plaintiff's condition, noting that "[w]e don't ever select one item and say that is the cause of any particular aggravation." 361 U.S. at 109, 80 S.Ct. at 175.

Based primarily on the temporal relationship between the accident and the onset of the tuberculosis, the jury found that the accident had legally caused the injury. The court of appeals reversed. In reversing the court of appeals to preserve the jury determination regarding medical causation, the Supreme Court noted that

> The jury's power to draw the inference that the aggravation of petitioner's tubercular condition, evident so shortly after the accident, was in fact caused by that accident, *was not impaired by the failure of any medical witness to testify that it was in fact the cause. Neither can it be impaired by the lack of medical unanimity as to the respective likelihood of the potential causes of the aggravation, or by the fact that other potential causes of the aggravation existed and were not conclusively negated by the proofs.*

361 U.S. at 109, 80 S.Ct. at 175 (emphasis added). The Court emphasized that, in cases involving issues of medical causation, it is not the function of a court to search the record for conflicting circumstantial evidence which supports alternative theories of causation, but rather the focal point of judicial review in such cases is the "reasonableness of the particular inference or conclusion" drawn by the jury. 361 U.S. at 110, 80 S.Ct. at 176. *Citing Rogers v. Missouri Pacific Railroad Co.,* 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957),[10] the Court held that the proofs justi-

---

**10.** In *Rogers,* the Supreme Court held that under the FELA, and thus also under the Jones Act, the test of a jury case is simply *whether* the proofs justify with reason the conclusion that

fied the conclusion of the jury that the accident caused the plaintiff's serious subsequent illness.

The rationale of *Sentilles* is applicable to this case. In *Sentilles,* no medical witness testified that the accident in fact caused the plaintiff's illness. Instead, the accident was merely identified as one of several possible factors that might have activated the plaintiff's dormant tubercular condition. The Court nonetheless held that the evidence was sufficient to support the jury's inference that the illness was caused by the accident. In this case, the evidence regarding medical causation is even more substantial. Although the complete etiology of all polymyositis has not been definitely proven, the plaintiff's expert medical witness has testified that, based on his examination and testing of Cella, his review of Cella's full medical history, his research of medical literature, and his analysis of documented case studies of polymyositis, it is his opinion within a reasonable degree of medical certainty that trauma was the cause of *this plaintiff's* polymyositis.

As noted above, Dr. Romain did not testify that he had definitively determined the full etiology of polymyositis; rather, he merely opined that the trauma experienced aboard the Hess caused or made symptomatic Cella's polymyositis-like condition. After hearing contrary opinions from the defendant's medical experts, the district court considered all the evidence presented at trial and concluded that Cella's condition was either caused or aggravated by the events that occurred aboard the Hess. Under the liberal standard of medical causation articulated and applied by the Supreme Court in *Sentilles,* we cannot say that this conclusion was not a reasonable one. It is, indeed, consistent with the undisputed facts that Cella was found fit for duty with no symptoms of polymyositis at the time he boarded the Hess and shortly after leaving the ship, with no other apparent causes for developing the condition, was de-

termined to be suffering from polymyositis which has become progressively worse to the point that he is now permanently disabled.

In sum, we are not left with the definite and firm conviction that the district court committed a mistake in reaching its conclusions regarding medical causation. Instead, we must find that the district court's conclusion regarding causation of Cella's condition is not only plausible in light of the record viewed in its entirety, but is in fact supported by substantial evidence.

### C. Jones Act Damages For Emotional Stress

The defendant next argues that the district court awarded Cella damages for emotional stress which was not related to either physical contact or the threat of physical harm. In *Lancaster v. Norfolk & Western Ry.,* 773 F.2d 807, 813 (7th Cir.), *cert. denied,* 480 U.S. 945, 107 S.Ct. 1602, 94 L.Ed.2d 788 (1987), we held that "the FELA does not create a cause of action for actions for tortious harm brought by acts that lack any physical contact or threat of physical harm." Since the Jones Act incorporates by reference the FELA standard of liability, the defendant argues that Cella may not recover damages for that portion of his injury attributable to emotional stress. The plaintiff contends that he may recover damages for the negligent infliction of emotional distress and invites us to consider the recent decisions of the Fifth Circuit on this issue. *See, e.g., Plaisance v. Texaco, Inc.,* 937 F.2d 1004 (5th Cir.1991). However, we need not at this time resolve the question whether damages may be awarded under the Jones Act for emotional stress.

The defendant raised this issue with the district court in its post-trial motions. The district court explicitly addressed this point and stated in its Amended Judgment:

> [T]his court did not award Cella damages for emotional stress.... [T]he court

---

*employer negligence played any part, even the slightest, in producing the injury* or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes.... Judicial appraisal of the proofs to determine whether a jury ques-

tion is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death.
352 U.S. at 506–07, 77 S.Ct. at 448–49 (emphasis added).

clearly awarded damages for Cella's permanent disability associated with his physical condition. Absolutely no reference to any award for emotional stress is made in the court's Memorandum and Order. The court's judgment in favor of Cella is based upon the government's negligence and Cella's resulting injuries. Cella's injuries were the result of physical contact combined with the threat of physical contact which accompanied the emotional abuse Cella sustained. The physical contact and threats thereof caused or made symptomatic Cella's physical condition, generally described as polymyositis. It is this physical condition and disability which is the basis for the damage awards in this cause.

Amended Judgment at 2–3 (emphasis added).

It is abundantly clear from this passage that, while Cella may have experienced emotional stress aboard the Hess, the district court did not award any damages based on injury resulting from that emotional stress. Any ambiguity with regard to the basis of the damage award that may have existed in the district court's Memorandum and Order is resolved by the court's explicit language in its Amended Judgment.

### D. *Damages*

On cross-appeal, plaintiff Cella challenges the district court's determination of damages. First, Cella argues that the district court erred in determining that Cella had reached maximum medical cure as of February 15, 1989. When it appears that a seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved. *Pelotto v. L & N Towing Co.,* 604 F.2d 396, 400 (5th Cir.1979). Dr. Romain diagnosed Cella as "permanently medically disabled" on February 15, 1989. Dr. Wissman's testimony supports this diagnosis, suggesting that while treatment for Cella's condition will require maintenance doses of medication, he will never be cured. 9/13/90 Tr. at 207–10. On this basis, the district court properly determined that all meaningful hopes for recovery had ended and Cella had reached the point of maximum medical cure.

Cella next argues that the district court erred in determining that he was contributorily negligent. He suggests that the court confused assumption of risk and contributory negligence in its analysis. The district court properly identified four factors to support its finding that Cella was contributorily negligent: (1) Although Cella injured his back lifting pallets, he was in the best position to assess his ability for heavy lifting and, moreover, was aware of his recent shoulder and hip injuries; (2) Cella contributed to his accident with the spaghetti pot since he was charged with the duty of washing the melted butter off the handle (even if it was not proper procedure for him to be so charged) and failed properly to perform this duty; (3) After each injury, Cella failed to seek immediate medical assistance (and sometimes even treated himself); and (4) Cella, by his own attitude and demeanor, contributed to the steward department tensions which ultimately gave rise to the threats of physical violence. Accordingly, the district court properly found that Cella was 40% contributorily negligent.

Finally, Cella argues that the district court erred in reducing his life expectancy for damage calculation purposes. Dr. Romain testified that Cella's disorder is life-threatening and that one-third of the patients that have the condition die. 9/11/90 Tr. at 27. The medical literature introduced at trial supports this observation, suggesting that the mortality rate of individuals with polymyositis is four times that of the general population. In its Amended Judgment, the court found Cella's life expectancy as of the date of trial to be 19.77 years—50% of his normal life expectancy according to a 1980 mortality table. Based on the record before it, the district court did not err in its determination of Cella's life expectancy.

### III.

### CONCLUSION

For the reasons stated above, the ruling of the district court is AFFIRMED.