23 F.3d 410
 62 USLW 2704
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Barbara HAYES, Special Administrator of the Estate of Cyndee
Hayes, Deceased, and Carol Sampson, Plaintiffs-Appellants,
v.
RAYTHEON COMPANY and Raytheon Service Corporation,
Defendants-Appellees.
 No. 92-4004.
 United States Court of Appeals, Seventh Circuit.
 Argued Sept. 21, 1993.
Decided April 21, 1994.
 
 Before ESCHBACH, FLAUM and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Cyndee Hayes and Carol Sampson both worked as reservations agents in the Chicago office of KLM Royal Dutch Airlines ("KLM"). Both also contracted cervical cancer, from which Ms. Hayes died in 1980. Ms. Sampson and Ms. Hayes' estate brought suit against Raytheon Company and its affiliate, Raytheon Service Corporation (collectively, "Raytheon") contending that they fell ill as the result of prolonged exposure to the radiant energy emitted by the Raytheon video display terminals ("VDTs") they had used in the course of their employment with KLM. The district court granted summary judgment in favor of Raytheon, concluding that the expert testimony on which plaintiffs relied to establish that the VDTS had caused Ms. Sampson and Ms. Hayes to become ill did not reflect sufficiently sound methodology to be admissible under Federal Rule of Evidence 703. We agree and affirm.
 
 I. BACKGROUND
 
 2
 Cyndee Hayes worked at KLM's Chicago office from May 1977 until her death in 1980. Carol Sampson worked in the same office from April 1979 until December 1980. Their job as reservations agents required them to take reservations over the telephone and enter them into KLM's computer network using a programmable terminal system manufactured by Raytheon in 1974. Each agent was stationed at a table with two VDTS placed back to back and sat directly in front of a VDT while accepting reservations. The placement of the VDTS allowed less than three feet of clearance between the sides of the VDTS and the telephone sets used by the reservations agents.
 
 
 3
 Both Ms. Hayes and Ms. Sampson were young and apparently healthy when they began work for KLM, and neither had any history of unusual illnesses. However, in 1979, two years after she began working at KLM, Ms. Hayes began experiencing menstrual irregularity. A biopsy revealed that she had cervical cancer. Although Ms. Hayes underwent a radical hysterectomy and later removal of her urinary bladder, the spread of the cancer to the surrounding pelvic area ultimately resulted in her death in 1980 at the age of 30.
 
 
 4
 Ms. Sampson learned in June of 1979 that she too had cervical cancer. Ms. Sampson had periodically visited a gynecologist since 1976 for routine examinations. Not until her 1979 examination, however, had anything abnormal been detected.[1] A followup examination in April 1980 revealed that Ms. Sampson's cervix exhibited marked dysplasia[2] and the continued presence of carcinoma in-situ.[3]
 
 
 5
 Suspecting that her cervical cancer may have been triggered by something in her work environment, Ms. Sampson consulted with Dr. Thomas F. Mancuso, a research professor in the Department of Health at the University of Pittsburgh's School of Public Health. Mancuso referred Ms. Sampson to Dr. Milton Zaret for an ophthalmic examination in order to determine whether she exhibited any indicia of harmful exposure to radiant energy. Dr. Zaret is an ophthalmologist whose use of ionizing radiation in the past to treat cancers of the eye and surrounding orbit had led him to conclude that exposure to such radiation was potentially detrimental to the patient. Approximately one-half of Dr. Zaret's practice now involves the examination and treatment of patients with injuries thought to have resulted from "radiant energy," a term that encompasses a broad variety of radiant emissions, including radio frequency, infrared, ionizing, ultraviolet, and sonic radiation. See Zaret Dep. 94.
 
 
 6
 When Dr. Zaret first examined Carol Sampson's eyes in early February 1981, he detected what he believed to be a radiant energy injury in the form of incipient cataracts, more marked in the right eye than her left. He advised her to avoid common sources of radiant energy, such as VDTs, microwave ovens, and citizen-band radio transmitters. Ms. Sampson returned to Dr. Zaret for another examination in June of 1981, when she began to experience a "veiling glare" while looking at bright lights, particularly during low-light conditions like nighttime driving. Although Dr. Zaret confirmed that Ms. Sampson was experiencing the symptoms of nascent cataracts; he also concluded that these were in an arrested or "forme fruste" stage. Nonetheless, Ms. Sampson's difficulties with glare increased, and when Dr. Zaret examined her for a third time in November of 1983, he noted for the first time a number of vesicles in her right eye on the anterior surface of the lens. Again Dr. Zaret concluded Ms. Sampson was suffering from incipient cataracts. In Dr. Zaret's opinion, these cataracts were triggered by exposure to "Hertzian" radiation (Zaret Dep. 153-54), a term which he uses to refer to "the invisible portion of the nonionizing band of radiations" (id. at 95).
 
 
 7
 Based on his examinations of Ms. Sampson and his review of her medical records, Dr. Zaret concluded that only a radiant energy injury could account for her cataracts, insitu cervical cancer, as well as the atrophic colitis that was diagnosed in 1981 after Ms. Sampson suffered a bout of rectal bleeding. In Dr. Zaret's opinion, the VDTs Ms. Sampson had used during her employ with KLM were the likely source of this injury.
 
 
 8
 Dr. Zaret was also asked to examine the medical records of Ms. Hayes. Although Dr. Zaret had never examined Ms. Hayes, he concluded in 1989 based on her records that radiant energy emitted by VDTs were the likely cause of the cancer which had ultimately taken her life.
 
 II. ANALYSIS
 
 9
 Our review of the district court's decision to grant summary judgment in favor of Raytheon is de novo. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). Of course, we examine the factual record in a light most favorable to the plaintiffs. Id. at 255, 106 S.Ct. at 2513. At the same time, we must keep in mind that Illinois law imposes the burden of proof on the plaintiffs to prove each of the key elements of her claim, including causation. E.g., Parker v. Freightliner Corp., 940 F.2d 1019, 1026 (7th Cir.1991); see Porter v. Whitehall Lab., Inc., 9 F.3d 607, 612 (7th Cir.1993). Thus, if upon review of the record we conclude that the plaintiffs failed to tender evidence from which a jury could reasonably find that Raytheon's product injured them, we must affirm the judgment. Id.
 
 
 10
 Our analysis, like the district court's, necessarily must focus on the affidavit of Dr. Zaret, on which the plaintiffs relied as evidence of a causal link between the Raytheon VDTs and the illnesses of Ms. Hayes and Ms. Sampson. If Dr. Zaret's opinion does not meet the requirements of expert testimony set forth in Rule 701 and 702, then the plaintiffs are without evidence of causation sufficient to avoid summary judgment. Our inquiry in this respect is guided by the Supreme Court's opinion in Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S.Ct. 2786 (1993), issued some seven months after the district court granted summary judgment. In Daubert, the Supreme Court held that an expert's opinion need not have attained "general acceptance" within his or her field before it may be admitted under Fed.R.Evid. 702. Id. at 2793-94. At the same time, the Court noted that the district judge "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 2795. The Court explained:
 
 
 11
 The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" and expert "may testify thereto." The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation.... [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation--i.e., "good grounds," based on what is known.
 
 
 12
 Id. (footnote omitted) (emphasis in original). Thus, when a party proffers the testimony of an expert, pursuant to Fed.R.Evid. 104(a), the district court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. Id. at 2796. Factors relevant to this assessment include (1) whether the expert's theory or technique has been or can be tested; (2) whether it has been published and/or subjected to peer review; (3) the known or potential rate of error of a particular technique as well as the standards (if any) governing its operation; and (4) acceptance of the theory or technique within the relevant scientific community. Id. at 2796-97. The Court emphasized that this inquiry is not rigid, but flexible. Id. at 2797.
 
 
 13
 Its overarching subject is the scientific validity--and thus the evidentiary relevance and reliability--of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.
 
 
 14
 Id.
 
 
 15
 Having reviewed the record in light of the principles set forth in Daubert, we conclude that Dr. Zaret's opinion was not adequate to establish a dispute of material fact as to whether the Raytheon VDTs injured Ms. Sampson and Ms. Hayes. Even assuming, as Dr. Zaret postulates, that chronic exposure to radiant energy emissions can result in the types of maladies that befell Ms. Sampson and Ms. Hayes,[4] for the following reasons, we nonetheless find his testimony (as proffered both in his affidavit and in his deposition) insufficient to permit a reasonable jury to conclude that any radiant energy emitted by the Raytheon VDTs in fact injured Ms. Sampson and Ms. Hayes:
 
 
 16
 1. Source of Radiation. In his affidavit, Dr. Zaret acknowledged the possibility that "radar, CB radios, commercial radio broadcasts, televisions, starters in florescent lights, wiring in buildings and cellular telephones, all sources of radiant energy, can be harmful...." Zaret Aff. p 15; see also Zaret Dep. 22-23, 28-29, 82, 112-13, 128-29, 177. He insisted nonetheless that "the overwhelming probability is that the work place is where most harmful exposures occur." Zaret Aff. p 15. Yet, nowhere in either his affidavit or in his deposition testimony did Dr. Zaret offer any reasonable basis for this key premise. He did observe that "[t]here are valid methods for determining the medical probability of the source of radiation causing the harm without knowing this with scientific certitude" (Zaret Aff. p 16); however, he did not identify what these methods are, whether he used any of them, and, if so, how they established that radiation emitted by the Raytheon VDTs was the likely source of injury to Ms. Sampson and Ms. Hayes. As we observed in Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago, 877 F.2d 1333, 1339 (7th Cir.1989), "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."[5]
 
 
 17
 2. Harmful Level of Radiant Emissions. An obviously critical aspect of Dr. Zaret's opinion and of the plaintiffs' case against Raytheon was the supposition that the Raytheon VDTs emitted radiant energy and at levels sufficient to injure the plaintiffs. Here a critical hole emerges in Dr. Zaret's reasoning. Dr. Zaret indicated repeatedly in his deposition that there was no known level at which radiant energy is either safe or harmful. See Zaret Dep. 86, 104, 115, 135-36, 188. In his affidavit, he reaffirmed that position, noting that "[i]t may not be possible to establish a single threshold level for exposure to nonionizing radiation since the risk of harm can be different for different groups of people." Zaret Aff. p 9; see also Zaret Dep. 122. Yet, at the conclusion of his affidavit, Dr. Zaret nonetheless ventured that "[t]he level of acceptable radiant energy is somewhere below 10-7 to 10-5 m W/cm2." Zaret Aff. p 31. We have previously observed that the party opposing summary judgment cannot create a dispute of fact with an affidavit that contradicts what the affiant said in prior testimony, at least without some plausible explanation for the conflict. E.g., Darnell v. Target Stores, 16 F.3d 174, 176-77 (7th Cir.1994); Richardson v. Bonds, 860 F.2d 1427, 1433 (7th Cir.1988); Babrocky v. Jewel Food Co. & Retail Meatcutters Union, Local 320, 773 F.2d 857, 861 (7th Cir.1985); cf. Deimer v. Cincinnati Sub-Zero Prod., Inc., 990 F.2d 342, 346 n. 3 (7th Cir.1993); Holland v. Jefferson Nat'l Life Ins. Co., 883 F.2d 1307, 1314 n. 3 (7th Cir.1989). No such explanation was forthcoming here. Dr. Zaret offered no basis for his new-found threshold, other than to note that "[t]his figure represents the background level of the sun's radiant energy at its maximum, where it is sufficient to interfere with radar transmission." Zaret Aff. p 31. We discern no basis, however, for the inference that anything greater than this level is necessarily harmful. See Cella v. United States, 998 F.2d 418, 423 (7th Cir.1993) ("An expert witness cannot simply guess or base an opinion on surmise or conjecture.").
 
 
 18
 In a like vein we note that Dr. Zaret repeatedly invoked his view that the safety standards that historically had governed the manufacture of VDTs were "fatally flawed" because they permitted emissions in excess of those which were known to produce injury in laboratory animals. Zaret Aff. p 18; id. paragraphs 2-5, 27, 29. Based on this notion, Dr. Zaret assumed that the Raytheon VDTs used by Ms. Sampson and Ms. Hayes in all probability emitted harmful levels of radiation. Zaret Aff. paragraphs 2, 18, 27, 29, 30. This is quite a leap. Dr. Zaret himself disclaimed any assertion that "all VDTs emit harmful levels of radiant energy" (Zaret Aff. p 27), and absent at least some evidence as to the emissions that Raytheon VDTs either were designed to permit or actually emitted in use, a factfinder could not reasonably assume based solely on the asserted fault in the industry standards that Raytheon's product in fact leaked radiation at harmful levels. See Kenosha Liquor Co. v. Heublein, Inc., 895 F.2d 418, 420 (7th Cir.1990) ("Expert opinions are worthless without data and reasons.").
 
 
 19
 3. Harmful Radiant Emissions by Raytheon VDTs. Equally important is the lack of trustworthy evidence in the record regarding the level of radiation to which the plaintiffs were exposed in the course of their employment with KLM. Dr. Zaret relied on two circumstances for his assumption that the Raytheon VDTs had emitted harmful levels of radiant energy: (1) what he believed to be the radiant energy injuries both Ms. Hayes and Ms. Sampson had suffered; and (2) a report prepared by Eli Port of Radiation Safety Services, Inc., based on his March 22, 1980 examination of the VDTs at KLM. See Zaret Dep. 192, 226. Both are problematic. Even if we assume that Ms. Hayes and Ms. Sampson were injured by exposure to radiant energy, their injuries do not establish harmful emissions by Raytheon's product, absent some evidence ruling out injury from the other common sources of radiant energy to which Ms. Hayes and Ms. Sampson were no doubt exposed. See section 1, supra; cf. O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1106-07 (7th Cir.1994) (rejecting physician's testimony that he could determine cataracts were radiation-induced just by their appearance on examination, concluding that the opinion lacked an adequate basis in scientific fact and methodology). Port's report, which Dr. Zaret at one point referred to as a "smoking gun" (App. 30), likewise misses the mark. Although Port detected no leakage radiation detectable above normal background levels for any of the sixteen Raytheon terminals he examined (App. 27), he did note "spurious off scale readings ... within several inches of the upper back of the consoles" (App. 28). In Dr. Zaret's view, this was enough to suggest that both Ms. Hayes and Ms. Sampson were exposed to harmful levels of radiation. Zaret Aff. p 13; Zaret Dep. 207-08, 226. Yet, Port also indicated that these readings "drop[ped] abruptly to background readings at further distances where the field strength drops off." App. 28. It is therefore unclear whether the typical user of these VDTs would have been exposed to the off-scale levels of radiation Port detected, given the limited range within which these "spurious" readings were noted. At the same time, Dr. Zaret himself was highly critical of the equipment and methodology Port employed, going so far in his deposition as to state several times that he would rely on nothing that Port said. Zaret Dep. 207-09. As the district court aptly observed: "We have a hard time understanding how Dr. Zaret can so emphatically rebut Port's report and then rely on a portion that arguably might support his theory." Memorandum and Order at 11 n. 6. Again, the rule that a witness may not without plausible explanation contradict in an affidavit what he said earlier in his deposition comes into play. See supra at 9. Although Dr. Zaret suggests in his affidavit that Port's methodology was adequate to "establish that leakage occurred and was reliable for that purpose only" (Zaret Aff. p 13; see also Zaret Dep. 207-08), he offers no reason for this conveniently selective view of Port's work. Indeed, Dr. Zaret reiterates his belief that Port's "methodology was not designed for [the] purpose [of detecting hertzian radiation], nor was his methodology reliable to establish which wave-lengths and intensities were being emitted." Zaret Aff. p 13. In view of these candid admissions, a jury could not reasonably have relied either on Port's survey or Dr. Zaret's construction of it to conclude that Ms. Hayes and Ms. Sampson were exposed to injurious levels of radiation.
 
 
 20
 Each of these gaps in Dr. Zaret's chain of reasoning leads us to conclude that his opinion lacks the rigor and objective support required to distinguish admissible scientific opinion from inadmissible speculation. See Daubert, 113 S.Ct. at 2795; Porter, 9 F.3d at 614-16. Thus, we believe the district court was correct to conclude that Dr. Zaret's opinion testimony was inadmissible. Because his was the only testimony offered to support plaintiffs' theory of causation, the court was compelled to enter summary judgment in Raytheon's favor on the product liability claims.
 
 
 21
 AFFIRMED.
 
 
 
 [1]
 A 1976 pap smear had yielded a "Class Two" finding; however, subsequent pap smears had produced normal results. See Zaret Dep. 155
 
 
 [2]
 "Dysplasia" refers to a change in the appearance of the cells. Zaret Dep. 160
 
 
 [3]
 "In situ" indicates that the cancer remained localized to the cervix and had not spread to the uterus and surrounding area. Zaret Dep. 142-43
 
 
 [4]
 Because we grant the plaintiffs the benefit of this assumption, we need not review the data upon which Dr. Zaret purportedly relied in concluding that exposure to radiant energy can and does result in injury to humans
 
 
 [5]
 We note that at his deposition, Zaret acknowledged that telephone headsets (which KLM reservation agents used in the course of their work) also might expose their users to enough radiant energy to result in both cancer and cataracts. Zaret Dep. 110-12. In his subsequent affidavit, Zaret attempted to modify this acknowledgement in a manner helpful to the plaintiffs' case, stating that "[i]t is possible that the telephone headsets worn by Carol Sampson and Cyndee Hayes acted as antennae by absorbing radiation from other leaking VDTs and radiating that additional energy into the vicinity where Ms. Sampson and Ms. Hayes worked.") Zaret Aff. p 17 (emphasis supplied)