**AMERICAN RIVER TRANSPORTATION COMPANY, Plaintiff/Petitioner,**

v.

**Charles PHELPS and American Commercial Barge Line Company, Claimants/Respondents.**

**No. 00–CV–0045–MJR.**

United States District Court, S.D. Illinois.

Aug. 2, 2001.

Teresa A. McNail, Goldstein & Price, St. Louis, MO, for American River Transportation Co.

Grey R. Chatham, Sr., Chatham & Babka, Belleville, IL, for Charles Phelps.

Ronald E. Fox, Fox, Galvin, LLC, St. Louis, MO, for American Commercial Barge Line Co.

## ORDER FOLLOWING BENCH TRIAL

REAGAN, District Judge.

### I. Introduction

On July 17, 1997, Charles Phelps, a deckhand employed by American Commercial Barge Lines, was injured on a barge owned by American River Transportation Company. In February 1998, Phelps sued American Commercial Barge Lines ("ACBL") in the Circuit Court of Madison County, Illinois under the Jones Act, 46 U.S.C.App. § 688, et seq. ACBL filed a third party action against American River Transportation Company ("ARTCO"). Phelps then amended his state court complaint to add ARTCO as a Defendant.

In January 2000, ARTCO filed suit in this Court seeking exoneration from liability or limitation of liability under 46 U.S.C.App. § 181, et seq. Initially, the case was assigned to the Honorable David R. Herndon. Judge Herndon restrained the commencement of prosecution of any other suits involving this accident and directed all parties having claims arising from the accident to file them in this Court on or before March 12, 2000. Charles Phelps filed a claim on January 26, 2000. American Commercial Barge Lines filed a claim on March 13, 2000.

Judge Herndon ordered that the claims of both Phelps and American Commercial Barges Lines could proceed. He defaulted all other claims as untimely-filed. Subsequently, the parties filed cross-claims, counterclaims, and amended claims. In late October 2000, the case was transferred to the undersigned Judge and given a firm trial setting. The various claims

presented at trial may be summarized as follows.

ARTCO, as owner of Barge XL–737, seeks exoneration from liability for any loss, damages, or injury arising out of the July 17, 1997 incident (Doc. 1).

In his second amended claim against ARTCO (Doc. 64), Phelps alleges that, as owner of Barge XL–737, ARTCO owed him a duty of reasonable care under the circumstances, and ARTCO breached that duty of reasonable care by negligently allowing a slippery substance to get on the deck of Barge XL–737 near the kevels, failing to warn Phelps that the slippery substance was on the deck, and failing to coat the working area of Barge XL–737 with non-skid paint. Phelps seeks $500,000 in damages from ARTCO.

Against ACBL, Phelps brings a two-count amended cross-claim based on the Jones Act (Doc. 65).[1] Count I alleges that ACBL owned, operated, and controlled the tug-boat M/V William Norman, that the William Norman was used to perform work on the navigable waters, and that ACBL breached the nondelegable duty it owed Phelps to maintain ACBL vessels in seaworthy condition by (a) failing to warn Phelps of a slippery substance on the deck of Barge XL–737, (b) failing to inspect the deck of Barge XL–737 to ascertain if any slippery substance was present, and (c) allowing Phelps to use a kinked or twisted face wire on the M/V William Norman. Count II of Phelps amended cross-claim against ACBL alleges that ACBL committed the following negligent acts or omissions: (a) failing to warn Phelps that a slippery substance was on the deck of Barge XL–737 while knowing that this substance presented a hazard to Phelps, (b) failing to inspect the XL–737's deck to ascertain if there was any slippery substance present, and (c) allowing Phelps to use a wire which was in a kinked or twisted position. Phelps seeks $500,000 plus costs and prejudgment interest from ACBL.

ARTCO's amended counterclaim against ACBL (Doc. 26), an admiralty and maritime claim under Federal Rule of Civil Procedure 9(h), alleges that any injuries to Phelps were caused by the fault, carelessness, or negligence of ACBL, the unseaworthiness of the M/V William Norman, and/or ACBL's failure to carry out its tasks in a safe and workmanlike manner. ARTCO prays for indemnification from ACBL *if* the Court finds ARTCO liable to Phelps, plus reasonable attorneys' fees from ACBL for the fees incurred by ARTCO to defend against the claims of Charles Phelps.

ACBL's claim against ARTCO (Doc. 9) alleges that all of Phelps' injuries and damages are due to ARTCO's failure to use reasonable care and/or failure to maintain Barge XL–737 in a seaworthy condition by (a) allowing oil to get on the deck of Barge XL–737, (b) failing to inspect the barge deck, (c) failing to warn persons in the vicinity of the deck kevels, and (d) failing to provide a barge with a reasonably safe walking surface. ACBL seeks indemnity from ARTCO for any damages which may be awarded to Phelps. Alternatively, ACBL seeks contribution from ARTCO, *i.e.*, recovery from ARTCO of that percentage of the judgment awarded to Phelps which is equal to ARTCO's degree of fault in causing Phelps' damages.

Trial commenced on June 26, 2001 and concluded on July 9, 2001. Following trial, the parties supplemented the record with

---

1. Phelps has pled *both* counts of his cross-claim against ACBL *under the Jones Act,* with Count I alleging unseaworthiness and Count II alleging negligence. As is described further below, however, Jones Act claims and unseaworthiness claims are distinct causes of action.

depositions, admissions, and additional evidence. As directed by the Court, counsel submitted proposed findings of fact and conclusions of law on or before Monday, July 23, 2001. The Court has heard and observed the witnesses, scrutinized the documentary evidence, and carefully reviewed all materials submitted by counsel. In accord with FEDERAL RULE OF CIVIL PROCEDURE 52(a), the Court now **FINDS** and **CONCLUDES** as follows.

## II. *Findings of Fact*

1. American Commercial Barge Lines ("ACBL") owned, operated, and controlled the Motor Vessel William C. Norman.

2. On May 27, 1997, ACBL entered into a "Fully Found Charter" agreement with Upper River Services, Inc. ("URS"). The term of the Charter was five months, commencing on November 1, 1997. Under this arrangement, ACBL provided the M/V William Norman, fully crewed, for towing services on URS' fleet on the upper Mississippi River near St. Paul, Minnesota.

3. URS operated a fleeting, switching, and maintenance service for barges in the St. Paul area. URS dispatched the M/V William Norman to move barges, transport supplies, and transport individuals, while ACBL retained ownership and operation of the M/V William Norman.

4. At all times relevant herein, American River Transportation Company ("ARTCO") owned a box barge known as Barge XL–737.

5. Equipped with fiberglass covers, Barge XL–737 was an inland river hopper barge used to transport dry cargo products on the inland rivers, including the Mississippi River.

6. On June 13, 1997, Barge XL–737 was cleaned, inspected, and repaired at ARTCO's facilities in New Orleans, Louisiana. The inspection included scrutiny of Barge XL–737's deck and deck fittings.

Repairs were made, included welding on the port stern corner of the barge.

7. On June 18, 1997, Barge XL–737 was moved into the tow of an ARTCO line boat, the M/V American Heritage, to begin traveling north on the Mississippi River. Barge XL–737 was empty during this northward journey.

8. In St. Louis, Missouri, Barge XL–737 (still empty) was taken from the tow of the M/V American Heritage and placed in the tow of another ARTCO line boat, the M/V Cooperative Vanguard.

9. Barge XL–737 was in the tow of the Cooperative Vanguard until it arrived at URS in St. Paul, Minnesota on July 7, 1997.

10. The general procedure and practice during the time Barge XL–737 was in tow on this northward trip was to check the condition of the XL–737 at least once during each six-hour watch. This check including inspection of fittings on the barge deck. Upon arrival at URS in St. Paul, the XL–737 was checked again.

11. ARTCO's Barge Maintenance Supervisor, Mike Wade, received no reports of any problems with Barge XL–737 at any time after June 13, 1997 (when the barge was cleaned, inspected, and repaired in New Orleans) up through July 7, 1997 (when the barge was delivered to URS).

12. No barges surrounding Barge XL–737 were pumped while the tow was en route from New Orleans to St. Paul.

13. Barge XL–737 was dropped at Mile 839 when it arrived at URS on July 7, 1997.

14. The normal practice when a barge, like those in the tow of the Cooperative Vanguard in July 1997, was dropped at URS was that fleet boat personnel would (a) inspect the barge and (b) replace any "hard" rigging on the tow with soft lines. Barges then would be dispersed into URS fleets.

15. ARTCO received no notification or any problem regarding Barge XL–737 when it arrived, was inspected, and was accepted into the URS fleet on July 7, 1997.

16. Barge XL–737 was moved at least twice within URS' fleeting facility between July 7, 1997 (when it was dropped at URS by the Cooperative Vanguard) and July 17, 1997 (the date of the accident involved herein).

17. On July 9, 1997, a barge breakaway occurred at the URS fleeting area. Twelve loaded barges broke away from the Kaposia Fleet. The Kaposia Fleet was operated by URS. Thereafter, URS hired an independent marine surveyor—Gerald E. Chapman of Manley & Manley, Inc.—to survey and report on any damage from the breakaway.

18. Chapman has worked in the marine industry for 35 years, has a license to operate a towboat, has attended numerous courses and seminars on safety involving vessels on the inland river system, and has served as supervisor of a barge cleaning and repair facility.

19. As part of the inspection following the breakaway, Chapman conducted an inspection of Barge XL–737 during the daylight hours of July 10, 1997. At that time, Barge XL–737 was on the outside of a URS fleet located at Mile 834. The barge was positioned in a manner such that its starboard and stern ends were open, and at least one barge was located on its port side.

20. Chapman visually inspected the open stern end as the tug approached the barge from the down river side. Then he boarded the XL–737, walked around the entire barge, inspected the deck fittings, and stood on each corner of the barge to check for damage.

21. Chapman, who carefully inspected the port and starboard corner kevels,[2] saw no oil or other slippery substance on the deck of the XL–737 on July 10, 1997. Chapman did report minor damage to the starboard side of Barge XL–737, which URS agreed to repair at no cost to ART-CO. That repair work was done at a later date, after the incident at issue herein.[3]

22. ARTCO's Barge Maintenance Operator Mike Wade received no information, from Chapman or otherwise, that any foreign substance was present on the deck of Barge XL–737 on July 10, 1997.

23. In July 1997, Charles Phelps was working as a lead deckhand or "leadman" aboard the M/V William Norman.

24. Phelps had been employed by ACBL since 1988 and was an experienced deckhand.

25. On July 16 or 17, 1997, URS dispatched the M/V William Norman to move some barges in its fleet.

26. Just after midnight on July 17, 1997, the William Norman pulled up to an empty box barge located in the URS fleet and began the process of "facing up" to the empty barge. The empty barge was ART-CO's Barge XL–737.

27. The crew of the M/V William Norman in the late night hours of July 16, 1997 and the early morning hours of July 17, 1997 consisted of Thomas Ball (the pilot), Phelps (the leadman), and Michael Craig (the deckhand). Ball, Phelps, and

---

2. A kevel is a belaying pin around which rigging, including face wires or lines, are secured.

3. Though not technically "color-blind," Chapman is color-deficient. Specifically, he has trouble distinguishing reds and blues, as his eyes impart red tint to what he views. This condition in no way rendered Chapman incapable of seeing oil or other foreign substances during his July 1997 inspection of Barge XL–737. Chapman had, in the past, seen and immediately recognized oil on the deck of a vessel.

Craig were working the aft or "after watch"—noon to 6:00 p.m. and midnight to 6:00 a.m.

28. Craig was the crew member immediately subordinate to Phelps. Phelps had the authority and responsibility to direct Craig.

29. As part of facing up to the barge, Phelps needed to secure several loops or "bites" of face wire around the kevels on Barge XL–737.

30. The empty XL–737 was riding higher in the water than the M/V William Norman. Two sets of triangular steps known as "tow knees" were used to access the barge from the William Norman.

31. As an initial step in the process of facing up, a rope (sometimes referred to as a "capstain line") was run between the sets of tow knees and fastened around the center kevel on the stern of Barge XL–737. This process commenced just after midnight on July 17, 1997.

32. The area where the M/V William Norman was facing up to Barge XL–737 was well lit. Flood lights were shining down on the work area. Phelps also was equipped with a flashlight. He was wearing steel-toed boots and a life-vest.

33. Phelps was attempting to secure two bites or loops of face wire to each of two corner kevels on Barge XL–737. Phelps walked up the port tow knee steps, stepped on to the deck of Barge XL–737, walked over to the port corner of the barge, straddled the port corner kevel, and placed one bite of wire around the kevel without difficulty. That wire was attached to the port winch.

34. Phelps then took a few steps back toward the port tow knee, lifted the second

bite of the port face wire, and returned to the port corner kevel. Phelps straddled the kevel, so that his right foot was roughly one inch from the edge of the barge. He was holding the second bite of face wire in both hands, while he looked around for deckhand Craig.

35. Phelps needed Craig's assistance to pull slack out of the port wire due to kinks in the wire. Craig had left his position on the port side of the M/V William Norman and was not present to pull slack for Phelps.

36. The kinks in the port winch wire on the M/V William Norman caused the wire to be heavier in Phelps' hands and added strain on his back. Phelps had used that wire before and had reported the kinked condition of the wire to the mate on the William Norman.[4]

37. Craig was not where Phelps expected him to be, as Phelps looked around for Craig's help. Phelps stood there for a "couple of seconds" and was about to yell for Craig, when Phelps' feet slid out from under him. Phelps fell backwards onto the deck and rolled off the edge of the Barge XL–737 into the river. His left arm was caught on the horn of the kevel and fractured near the elbow. Craig was on the starboard side of the William Norman when he heard the splash of Phelps falling into the river.

38. Pilot Tom Ball was on watch and witnessed Phelps fall into the river. Ball sounded the general alarm. Phelps was pulled out of the river, taken to the dock, and transported to a hospital in St. Paul, Minnesota. After waiting roughly three hours for treatment, during which time a variety of tests were run,[5] Phelps under-

---

4. The port winch wire on the M/V William Norman was replaced on July 23, 2001 (six days after Phelps' accident).

5. Phelps had to wait for pain medication until after drug testing was complete. The drug testing was delayed because Phelps was not able to urinate immediately.

went surgery on his arm. He spent three days at the St. Paul, Minnesota hospital where surgery was performed.

39. Pilot Ball completed an accident report ("Vessel Employee Personal Injury Report") and faxed it to ACBL's office. The report contains no reference to any oil on the deck of Barge XL–737. Ball was unaware of the presence of oil on the deck at that time.

40. In the light of day on July 17, 1997, crew members of the M/V William Norman located Barge XL–737, boarded the barge, and took photographs of the deck. Those photographs show oil on both stern corner deck fittings, including the area in which Phelps was standing when he fell.

41. Ball both saw and felt the oil on the deck of Barge XL–737 at that time.

42. Jerry Oleson, chief engineer on the William C. Norman on the date of the accident, climbed aboard Barge XL–737 and saw and felt oil on the deck.

43. Captain Jerry Beasley, the other pilot of the M/V William Norman, and Elwin J. Elmore, a mate on the M/V William Norman, also saw oil in the area of the deck where Phelps fell.

44. The oiling and lubricating of ratchets is (and was in July 1997) a common practice while barges are being moved and tows are being broken and coupled to go through river locks.

45. In effect in July 1997 were certain safety rules promulgated by ARTCO, including Rule 41, which provided:

"All areas of the deck, including all gangways and walkways, must be kept free of all oil, grease, debris and foreign substances of every type and description. Report any such conditions at once to your supervisor. Clean up such areas with proper materials, and/or sprinkle sand on any slippery or icy spots."

46. ARTCO's boats were provided with rags and absorbent pads to clean and remove oil from barge decks, whenever needed.

47. Barge XL–737 was stocked with a sufficient supply of rags and cleaning materials in June and July 1997.

48. The crew members of the M/V Cooperative Vanguard were aware of Rule 41 in July 1997. ARTCO's safety rules were posted in the crew lounge of the M/V Cooperative Vanguard at that time.

49. No evidence presented at trial established that any ratchets or other equipment aboard Barge XL–737 were lubricated with oil or grease at any time before Barge XL–737 arrived at URS on July 7, 1997.

50. No oil, grease, or other foreign substance was present on the deck of Barge XL–737 when it arrived at URS on July 7, 1997. No such substance was present on the deck of Barge XL–737 on July 10, 1997.

51. Charles Phelps did not see oil or other foreign substance when he stepped aboard the deck of Barge XL–737 on July 17, 1997.

52. The value of ARTCO's interest in Barge XL–737, immediately after the accident, did not exceed the sum of $110,000.

53. In July 1997, ACBL had in place certain safety rules and procedures that applied to the crew on the M/V William Norman. A section of written rules entitled "General Rules and Safe Work Practices" includes the following:

"Replace face wires, wing wires, and stationary wires when worn, or if they have kinks or twists."

54. According to pilot Ball, the practice on ACBL boats was not to change every face wire that had a kink but rather to change a face wire if the kinks became

dangerous in the opinion of the crew and/or captain.

55. Despite the fact that Phelps reported the kinked port face wire to the mate of the M/V William Norman prior to July 17, 1997, the wire was not replaced.

56. ACBL Safety Rule 1.4(10) provides:

"Always inspect equipment and safety devices **before** operating and immediately report any defects to your supervisor or employee in charge."

57. Neither Phelps nor Craig recalled making any such inspection before they began facing up to Barge XL–737 on July 16 or 17, 1997.

58. Another ACBL safety rule admonishes:

"When possible, all wires and lines should be handled from the line deck of a barge."

59. The line deck of the barge does *not* include the area on the outside of a kevel. Just prior to falling, Phelps was standing over the port stern kevel with his right foot on the *outside* of the kevel, approximately one inch from the edge of the barge. Phelps had secured face wires around corner kevels using this same straddling method previously. ACBL had never reprimanded him for this conduct.

60. Charles Phelps was born on September 2, 1952. He was 44 years old when he sustained the injury involved herein. He then was 6', 4" tall, weighed 210 pounds, and smoked two packs of cigarettes a day.

61. In the July 17, 1997 accident, Phelps badly injured his left arm. Specifically, he sustained a super condylar fracture of his left distal humerus. Initially, he was treated at St. Paul/Ramsey Medical Center in Minnesota.

62. At St. Paul/Ramsey, no open wounds were noted, a long splint was applied, and x-rays revealed a transverse fracture through the epicondyles extending into the articular surface with slight posterior displacement of the distal fragment and soft tissue swelling.

63. On July 18, 1997, Phelps underwent surgery involving a screw and plate fixation of fracture of the distal humerus, a screw and wire fixation of the olecranon fracture, and a 3.5 reconstruction plate of the distal humerus. In layman's terms, two plates were inserted in Phelps' arm, one of which was held in place with six screws and the other which was held in place with five screws. Additionally, three separate screws were inserted with a cannulated wire.

64. On July 19, 1997, Phelps was transferred from St. Paul, Minnesota to Belleville, Illinois, where he came under the care and treatment of Dr. Stephen Kappel, a board certified orthopedist. Phelps was under the care and treatment of Dr. Kappel from July 30, 1997 until April 8, 1998.

65. Dr. Kappel first examined Phelps on July 30, 1997, approximately two weeks after Phelps sustained his injury. Excellent alignment was noted, all nerves were intact, Phelps was able to make a full fist, was able to extend his fingers straight out, and had 40/70 degrees of motion.

66. On August 20, 1997, Kappel recommended a home exercise program. On September 3, 1997, the fracture line was no longer visible on x-rays. Physical therapy was recommended.

67. From September 5, 1997 to October 10, 1997, Phelps participated in sixteen physical therapy sessions.

68. On January 2, 1998, Phelps underwent an out-patient procedure (performed by Dr. Kappel) to remove certain hardware—the olecranon wire fixation—from his left elbow, due to tenderness over the knot on the tension band wire which had been implanted. The fracture itself had

healed nicely at that time, and no complications or abnormal findings were noted during the surgery. Two plates and eleven screws remain in Phelps' left arm today.

69. On April 2, 1998, Dr. Kappel sent Phelps to the "Back–to–Work" Center at St. Elizabeth's Hospital in Belleville, Illinois, for a functional capacity evaluation. The report generated from that evaluation concluded that Phelps was unable to perform the duties of a lead deck hand. The Center recommended that Phelps be retrained for a "more sedentary position with no repetitive lifting above chest level." Dr. Kappel agreed with this recommendation and testified at trial that these limitations are permanent.

70. Phelps reached maximum medical improvement ("maximum cure") on April 8, 1998.

71. As a result of the injuries sustained by Phelps in the July 17, 1997 incident, ACBL paid Phelps' medical expenses totaling $32,299.53 and living expenses totaling $5,320.[6]

72. Dr. Kappel last saw Phelps on March 17, 1999, at which time he had residual weakness and sensitivity, despite excellent range of motion. Dr. Kappel recommended vocational rehabilitation for retraining and recommended work involving light- to medium-range physical demands. Additionally, Dr. Kappel opined that Phelps, on a permanent basis, would suffer from increased sensitivity (because his ulnar nerve was transposed as part of his surgical treatment) and residual weakness in his left arm.

73. Dr. Mitchell B. Rotman, an orthopedic surgeon from St. Louis University Hospital in St. Louis, Missouri, conducted an independent medical examination of

Phelps, at the request of ARTCO. Dr. Rotman specializes in the treatment of arm and hand injuries.

74. Dr. Rotman produced two reports, the first in February 2001 and the second in March 2001. When he completed the first report, Dr. Rotman had not yet examined Phelps, but he had reviewed Phelps' x-rays and related records. Dr. Rotman's impression in February 2001 was that there was no objective evidence of ulnar nerve dysfunction in Phelps' hand or arm, that Phelps' injury had healed well, and that Phelps could return to "full activities as a lead deck hand."

75. Dr. Rotman examined Phelps on March 10, 2001. In his report following that examination, Dr. Rotman noted that Phelps had an excellent result from the elbow fracture surgery. Specifically, Phelps had smooth motion in the left elbow, had normal ulnar nerve function, had no swelling at the elbow, had full supination and pronation bilaterally, had only slight atrophy in the elbow region (no atrophy in the hand), had excellent hand strength, normal grip strength, equal pinch strength on both sides, and could easily make a full fist.

76. At trial, Dr. Rotman opined that, to a reasonable degree of medical certainty, Phelps now can return to work in any capacity, even heavy barge work. Rotman opined that Phelps will not require future medical treatment and is not more susceptible to arthritis due to his injury.

77. Dr. Rotman did note that Phelps has a 14 cm. scar over the back of his left elbow and complains of sensitivity in the area where the nerve was transposed.

78. The Court finds that when Phelps was released from Dr. Kappel's care, he

---

**6.** The $32,299.53 figure reflects bills for the services of a managed care nurse for Phelps—through Concentra Managed Care Services. At trial, ARTCO contested the inclusion of Concentra's costs as true "cure" expenses.

could not return to the demanding work of a deckhand, which requires heavy lifting (exertion of more than 70 pounds of force), standing for long periods of time, stooping, bending, kneeling, using ladders, climbing cables, tightening wires, repetitive arm motion, and working/balancing on unstable surfaces.

79. The Court further finds that, as of today, Phelps is incapable of performing the duties of a deckhand and incapable of heavy-duty work (including barge work).

80. Since April of 1998, Phelps has been (and is) capable of returning to work in the light and medium job categories.

81. Prior to the July 17, 1997 accident, Phelps earned these wages at ACBL:

1993: $21,051.57
1994: $23,441.33
1995: $25,327.
1996: $28,910.
1997: $19,450.

82. Phelps currently is 48 years old. He has a life expectancy of 28.9 years.

83. Phelps completed high school plus two years of college courses at Southern Illinois University. He served in the United States Air Force after high school. Before working for ACBL, Phelps held employment for two or three years as an electronics technician and for three additional years operating the closed-circuit televisions at Fairmont Park Race Track.

84. After being released by Dr. Kappel, Phelps unsuccessfully sought employment. First, Phelps requested (three times) to return to work at ACBL. ACBL would not rehire him. Next, Phelps contacted the State of Illinois' Department of Rehabilitation Services ("DORS"), but he was told that he was not sufficiently disabled for their resources. Then, Phelps applied for various positions at Home Depot, Kohl's, Radio Shack, Circuit City, and Lowe's. None of those applications resulted in him securing work.

85. In early 2000, Phelps was hired by an individual named Gunther Feix who provided training in the sale, repair, and reclamation of computers.

86. Phelps earned no wages in the years 1998 and 1999. As of July 2000, Phelps had earned $300 for that year ($210 for computer work with Feix and $90 for lawn mowing services). No records were provided to document Phelps' additional wages (if any) for Feix in the remainder of 2000.

87. Currently, Phelps is finalizing plans to open his own computer repair business.

88. As a result of the July 17, 1997 injury, Phelps incurred medical bills totaling $32,299.53. Of that total, $26,126.38 constitutes "cure."

89. As a result of the July 17, 1997 injury, Phelps sustained *past* wage losses (for the period of 7/18/97 to 7/31/01) totaling $128,057. The Court reaches that figure by the calculations delineated below, in ¶ 90.

90. The Court starts with Phelps' 1996 wages ($28,910). Using that figure as a base wage rate, the Court factors in a 3% wage increase per annum. From January 1, 1997 through July 17, 1997 (the date of the injury), Phelps earned $19,550. From July 18, 1997 until December 31, 1997, Phelps would have earned another $13,706. From 1998 through 2000, he would have earned $30,671, $31,591 and $32,539, respectively. Pro-rating estimated wages for 2001 (from January 1, 2001 through July 31, 2001) leads to a figure of $19,550. Combining $13,706, $30,671, $31,591, $32,539 and $19,550 produces a total of **$128,057 in *past* wage loss.**

91. As a result of the July 17, 1997 injury, Phelps no longer target shoots with his bow, cannot lift heavy objects, cannot climb ladders, and cannot swim as well as he used to. His left arm bothers him if he

holds it up to read a book for an extended period. The injury also adversely affected his sex life. Phelps has a scar on his left arm from the surgical procedure.

92. The scarred area of Phelps' arm is sensitive if it is bumped. He avoids roller coaster rides and other activities that might result in his arm being bumped or jarred. Phelps is able to cut grass and is able to drink left-handed. He does not take (and has not taken for several years) prescription medication for arm pain. He takes aspirin, as needed, if he over-exerts himself.

93. To calculate *future* wage loss, the Court must make four determinations: (1) Phelps' base wage level; (2) the length of time his future wages will be lost; (3) the percentage of impairment of Phelps' earning capacity; and (4) the appropriate discount rate.

94. The appropriate base wage level is $28,910 (what Phelps earned in 1996, the year before the accident). It is reasonable to expect that Phelps would have enjoyed 3% annual increases in his wages.[7] The Court further finds that Phelps would have worked until age 65. Having carefully considered all the medical evidence, including the testimony of Drs. Kappel and Rotman (and choosing to accept Dr. Kappel's testimony as more credible and more amply supported by the record), the Court finds that the July 17, 1997 accident impaired Phelps' earning capacity by 40%. Finally, the Court uses a discount rate of 3.36% to reduce future wages to net present value.[8]

95. Applying this methodology, the first year of the income stream (pro-rated from August 1, 2001 to December 31, 2001) equals $13,965. Lost wages were awarded under ¶ 89 up through July 31, 2001. The last year of the income stream is pro-rated from January 1, 2017 to September 2, 2017, when Plaintiff attains age 65. The total income stream to be discounted to net present value is $691,853.[9] Applying the discount rate of 3.36% to this total ($691,853) yields a net present value of $506,995 for the stream of future earnings.

96. Factoring in the impairment of Phelps' earning capacity percentage (40%), the Court finds that Phelps' **future wage loss, reduced to present value, totals $202,798** ($506,995 × 40%).

97. The Court finds that, as the result of the July 17, 1997 accident, Phelps':

damages for **past pain and suffering are $50,000,**

damages for **disfigurement are $10,000,** and

damages for **disability** (due to weakness and sensitivity of left arm plus the effect on Phelps' hobbies and daily living activities) **are $75,000.**

98. The Court awards no damages for future medical expenses and notes that past medical expenses have already been paid by ACBL.

### III. *Conclusions of Law*

1. The Constitution of the United States extends to Article III courts the power to hear "all Cases of admiralty and maritime Jurisdiction." *Weaver v. Holly-*

---

7. This actually is a conservative estimate, given the evidence before the Court. In the four years prior to the accident, Phelps enjoyed wage increases of approximately 10% each year.

8. The discount rate is based on the most recent (7/26/01) one-year U.S. Treasury bill rate.

9. The $691,853 total results from adding $13,965 (2001), $34,520 (2002), $35,556 (2003), $36,622 (2004), $37,721 (2005), $38,853 (2006), $40,018 (2007), $41,219 (2008), $42,455 (2009), $43,729 (2010), $45,041 (2011), $46,392 (2012), $47,784 (2013), $49,217 (2014), $50,694 (2015), $52,215 (2016), and $35,854 (2017).

wood Casino–Aurora, Inc., 255 F.3d 379, 381–82 (7th Cir.2001), citing U.S. Const. art. III, § 2. That power was codified at 28 U.S.C. § 1333(1), which provides for original jurisdiction of any civil case of admiralty or maritime jurisdiction.

2. ARTCO, the named plaintiff/petitioner herein, seeks to be exonerated completely from liability or to have its liability limited under federal laws providing for limitation of a vessel owner's liability. This case falls within federal admiralty and maritime jurisdiction, and the Court may exercise subject matter jurisdiction under 28 U.S.C. § 1333.

3. The Limitation of Liability Act, 46 App. U.S.C. § 181, et seq., gives shipowners the right to seek limitation of their liability for maritime injuries.

■ 4. The Limitation Act vests in federal courts exclusive jurisdiction, pursuant to their admiralty jurisdiction under 28 U.S.C. § 1333(1), to decide whether a shipowner's liability should be limited. In re McCarthy Bros., 83 F.3d 821, 826 (7th Cir.), cert. denied, 519 U.S. 950, 117 S.Ct. 361, 136 L.Ed.2d 253 (1996).

■ 5. Once a limitation action is properly filed in federal district court, the court retains exclusive jurisdiction over the matter, and all claims against the shipowner must cease. McCarthy Bros., 83 F.3d at 826. A shipowner who meets all statutory prerequisites for a limitation action may still lose the federal admiralty forum if a certain abstention doctrine applies. Id. at 828 ("[W]here the case falls within the Langnes rule of abstention, the district court permits proceedings in state court to go forward on the question of liability and retains jurisdiction over any question that might arise as to the shipowner's right to limit his liability.").

6. The doctrine of Langnes abstention was inapplicable to the instant suit, and this Court has proceeded to decide the issues of liability and limitation.

■ 7. Once all potential claimants are before the federal court in a Limitation Act proceeding, the court must determine (a) whether a loss, in fact, occurred, (b) whether the loss was due to the negligence of the owner, and (c) whether the loss occurred with the owner's privity or knowledge. **24 Tulane Maritime Law Journal 659, 662 (Spring 2000).**

8. 46 App. U.S.C. § 183(a) provides:

"The liability of the owner of any vessel ... for any ... act matter, ... loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner ..., shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

9. The phrase "without the privity or knowledge of such owner" implies that the owner be unaware of the fault in his vessel that caused an accident. United States v. Ohio Valley Co., Inc., 510 F.2d 1184, 1188 (7th Cir.1975).

■ 10. Once an injured seaman establishes that negligence or unseaworthiness caused his injuries, the burden shifts to the vessel owner to establish lack of privity or knowledge of the dangerous condition that caused the injury. Brister v. A.W.I., Inc., 946 F.2d 350, 355 (5th Cir. 1991).

11. If a petitioner, such as ARTCO, is entitled to exoneration, "the issue as to limitation of liability is of no consequence," because the "doctrine of limitations of liability presupposes that a liability exists which is to be limited. If no liability exists there is nothing to limit." Petition of Atlass, 350 F.2d 592, 593 (7th Cir.1965), cert. denied, 382 U.S. 988, 86 S.Ct. 556, 15 L.Ed.2d 476 (1966). So, in a proceeding to

limit liability, two duties are imposed upon the court:

"The first is to ascertain whether any liability exists. If it is found to exist the second duty arises, which is to ascertain whether the loss or damage was occasioned or incurred without the 'privity or knowledge' of the owner of the ship. If no liability is found to exist, the absence of all liability is to be decreed, and there the matter ends."

*Id.*

12. The Jones Act, 46 U.S.C.App. § 688, creates a cause of action for seamen who are injured by the *negligence* of owners of unseaworthy vessels. *Rufolo v. Midwest Marine Contractor, Inc.,* 6 F.3d 448, 450 (7th Cir.1993), *overruled on other grounds,* 511 U.S. 1050, 114 S.Ct. 1609, 128 L.Ed.2d 337 (1994). Congress intended the Jones Act to give seamen an available remedy for injuries sustained in an inherently dangerous profession. *Kelley v. Sun Transp. Co.,* 900 F.2d 1027, 1031 (7th Cir. 1990).

13. The Jones Act gives an injured seaman the litigation options of (1) suing directly under the federal court's general admiralty jurisdiction, or (2) suing for damages at law, in either (a) state court or (b) a federal district court under the Jones Act. *Wingerter v. Chester Quarry Co.,* 185 F.3d 657, 666 n. 5 (7th Cir.1999).[10]

14. Claims brought under the Jones Act and claims of unseaworthiness under general maritime law "are distinct causes of action, the elements of which differ somewhat." *Wingerter,* 185 F.3d at 666. *See also Brister,* 946 F.2d at 355 (**contrasting Jones Act and unseaworthiness claims**).

15. To qualify as a seaman under the Jones Act, an employee's duties must con-

tribute to the function of the vessel or to the accomplishment of its mission. *Weaver,* 255 F.3d at 386–87, *quoting McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 355, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991). Additionally, the seaman must have a connection to a vessel in navigation that is substantial in terms of both duration and nature. *Id., citing Chandris v. Latsis,* 515 U.S. 347, 368, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). Finally, although the requirement is not expressly stated in the Jones Act itself, the Supreme Court has long required that the injury occur through the employee's relationship to a vessel on a *navigable* body of water. *Id.*

16. Charles Phelps, claimant herein, is a Jones Act seaman.

17. Only the seaman's employer is a proper defendant on a Jones Act claim. *Wingerter,* 185 F.3d at 666. Phelps brings Jones Act claims against ACBL, his employer.

■ 18. Under the Jones Act, the employee/seaman's burden to prove causation is quite light. Indeed, this burden has been described as "featherweight." *Cella v. United States,* 998 F.2d 418, 427 (7th Cir.1993).

19. A Jones Act seaman (Phelps) must merely establish that the acts or omissions of his employer (ACBL) played some part, no matter how small, in producing the seaman's injury. *Cella* at 428. This standard of causation has been called the "producing cause" standard.

■ 20. A Jones Act seaman must act with ordinary prudence under the circumstances of his employment, which include not only his reliance on his employer to provide a safe work environment but also

---

**10.** A plaintiff that invokes admiralty jurisdiction is not entitled to a jury trial. *Wingerter,*

185 F.3d at 667, *citing* Fed.R.Civ.P. 38(e).

his own experience, training, or education. *Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331, 339 (5th Cir.1997).

21. In an action under the Jones Act, a seaman's negligence is not a complete bar but, instead, reduces his damages as comparative fault. *See Kelley v. Sun Transp. Co.,* 900 F.2d 1027, 1029 (7th Cir.1990) **(Noting that, in Jones Act case, the plaintiff's recovery is reduced under a contributory negligence analysis: "The inquiry at trial should endeavor to apportion responsibility for the injury.").** The fact that a Jones Act seaman "may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished ... in proportion to the amount of negligence attributable" to the seaman. *Id.* at 1031, *quoting* 45 U.S.C. § 53.

22. In addition to his Jones Act claim against ACBL, Jones alleges that ACBL breached its duty to maintain its vessel, the M/V William Norman, in a seaworthy condition.

23. The admiralty doctrine of unseaworthiness imposes an absolute, nondelegable duty on a shipowner to provide a vessel and its equipment, appurtenances, and crew reasonably suited for their intended purposes. *Brister,* 946 F.2d at 355. *Accord Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.,* 376 U.S. 315, 317 n. 3, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964). Accordingly, the seaworthiness issue is treated like a breach of warranty, rather than the narrower duty-breach inquiry for negligence claims. *Brister,* 946 F.2d at 355.

24. The doctrine of unseaworthiness imposes liability without fault. *Hughes v. ContiCarriers and Terminals, Inc.,* 6 F.3d 1195, 1197 (7th Cir.1993). *Accord Brister,* 946 F.2d at 355 **("Unlike a Jones Act claim, unseaworthiness is 'predicated without regard to fault or**

**the use of due care.' ").** However, there still must be a defect in the vessel for a claimant to succeed on an unseaworthiness claim. *Hughes,* 6 F.3d at 1197.

25. To recover damages under an unseaworthiness theory, a seaman must show that an unsafe condition on the vessel caused his injury. *Hughes,* 6 F.3d at 1197. "To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Brister,* 946 F.2d at 355, *quoting Johnson v. Offshore Express, Inc.,* 845 F.2d 1347, 1354 (5th Cir.), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988).

26. The standard for unseaworthiness is not perfection but, rather, reasonable fitness or suitability for the vessel's intended service. *Hughes,* 6 F.3d at 1197. Unseaworthiness may arise from the employment of an unsafe method of work, "such as the shipowner's failure to provide adequate equipment for the performance of an assigned task or necessary safety equipment." *Vargas v. McNamara,* 608 F.2d 15, 18 (1st Cir.1979).

27. A vessel's duty to furnish seamen with tools reasonably fit for their intended use (the duty of seaworthiness) is absolute and is completely independent of the vessel owner's duty to exercise reasonable care under the Jones Act. *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 327, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

28. Against ARTCO, Phelps brings negligence claims. The standard for negligence under general maritime law is higher than the featherweight burden of proving causation in a Jones Act case. *In re Cooper/T. Smith,* 929 F.2d 1073, 1076 (5th

Cir.), *cert. denied,* 502 U.S. 865, 112 S.Ct. 190, 116 L.Ed.2d 151 (1991).

29. To prove negligence against ART-CO, Phelps had to demonstrate that ART-CO owed him a duty, that ARTCO breached that duty, that Phelps suffered an injury as a result of that breach, and that a causal connection existed between ARTCO's conduct and Phelps' injury. *In re Cooper,* 929 F.2d at 1077.

■ 30. ARTCO owed Phelps a duty to exercise reasonable care under the circumstances. *See, e.g., Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 632, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959) (**"the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances"**). There is no evidence that ARTCO breached that duty or that any conduct by ART-CO caused Phelps' injury.

31. There was no oil or other foreign substance on the deck of Barge XL–737 when it arrived at URS on July 7, 1997. There was no oil or other foreign substance on the deck of Barge XL–737 three days later when Chapman inspected the barge, including the deck fittings.

32. There is no evidence whatsoever that any ratchets were lubricated on the deck of Barge XL–737, while the barge was en route from New Orleans to St. Louis to St. Paul. Even if such lubrication did occur on XL–737's northward journey, no oil, grease, or other foreign substance *remained* on the barge deck when the XL–737 was delivered to URS in St. Paul ten days before Phelps' accident.

33. The oil near the port stern kevel where Phelps slipped on July 17, 1997 resulted from actions taken *after July 10, 1997* while Barge XL–737 was in URS' custody. During that time period, the XL–737 was moved around (not by ART-CO) within URS' fleet.

34. ARTCO neither caused nor contributed to the presence of the oil on Barge XL–737 and had no knowledge of the existence of that oil. The evidence in the record did not prove *who* caused the oil to be present on the XL–737 or *how* that oil was placed on the barge deck. Clearly, however, ARTCO had no role in the oil getting or staying there and had no knowledge of its presence.

35. Stated simply, there is no causal connection between any conduct by ART-CO and the injuries or damages sustained by Phelps. The first two of Phelps' three negligence claims against ARTCO—(1) that ARTCO breached its duty of reasonable care by allowing oil to get on the deck near the kevel and (2) that ARTCO breached its duty of reasonable care by failing to warn Phelps of the oil near the kevel—fail.

■ 36. Phelps' third negligence claim against ARTCO—that ARTCO breached its duty of reasonable care by failing to paint the working area of Barge XL–737 with non-skid paint—also fails.

37. Testimony at trial established that it was quite *un* common for a covered hopper barge to be coated with non-skid paint. The use of non-skid paint on such barges is not standard industry practice. Moreover, maintaining non-skid paint would be nearly impossible on a barge deck in the difficult environment in which Barge XL–737 worked (bad weather conditions, the constant presence of moisture from the river, and the frequent connecting and disconnecting of heavy metal rigging on the deck).

38. Based upon the evidence presented with respect to custom and practice, ART-CO's failure to apply non-skid paint to the deck of Barge XL–737 did not constitute a breach of the duty of reasonable care owed to Phelps and did not constitute negligence by ARTCO.

■ 39. Nor did the absence of non-skid paint render Barge XL–737 unseaworthy.[11] ARTCO delivered a seaworthy barge, without any oil or foreign substance on the deck, to the fleet at URS on July 7, 1997.

40. ARTCO exercised reasonable care with respect to Barge XL–737.

41. Phelps' injuries and damages were not caused or contributed to by any fault, neglect, or want of care on the part of ARTCO. ARTCO is entitled to complete exoneration from liability to Phelps.

42. Since ARTCO did not breach any legal duty to Phelps and is in no way liable to Phelps, ACBL's claims against ARTCO for contribution and indemnity fail.

■ 43. The kinked port face wire on the M/V William Norman constituted a breach of ACBL's duty to provide Phelps with a seaworthy vessel. ACBL did not furnish Phelps with adequate equipment to perform his assigned tasks, as that wire was defective. ACBL is liable to Phelps for breaching its duty of unseaworthiness as to the M/V William Norman.

■ 44. ACBL also is liable to Phelps under the Jones Act. ACBL negligently allowed Phelps to use a kinked, defective face wire, failed to enforce its own safety rules (requiring crew to handle wires from the line deck of the barge, requiring the crew members to inspect equipment before using it, and requiring replacement of kinked face wires), and allowed crew members to be absent from their posts (deckhand Craig was not where he should have been to assist Phelps with the slack in the port face wire).

■ 45. Phelps was negligent in failing to inspect the well-lit barge deck of Barge XL–737 before walking and working in that area and in failing to follow ACBL safety rules and procedures regarding handling wires from the line deck of a barge.

46. Phelps's damages total $465,855 on his unseaworthiness claim against ACBL and $465,855 on his Jones Act claim against ACBL.[12] However, to avoid a double recovery, the Court only awards this amount once.

47. The Court already has noted that, as to the Jones Act claim against ACBL, Phelps' own negligence is not a bar to recovery but reduces his damages as comparative fault. *Kelley,* 900 F.2d at 1031–32. As to the unseaworthiness claim against ACBL, Phelps' damages must be reduced in a similar fashion.

48. Courts have noted that, because unseaworthiness claims are not grounded in negligence and are technically a form of liability without fault, "comparative negligence" and "comparative fault" are not the most apt nomenclature to apply when assessing an injured plaintiff's conduct. But Courts have used both terms to describe the analysis of the plaintiff/seaman's actions in unseaworthiness cases. *See Neely v. Club Med Management Services, Inc.,* 63 F.3d 166, 199 n. 37 (3rd Cir.1995).

49. Some courts have suggested the phrase "comparative causation" as more conceptually precise terminology. *See Neely* at 199 n. 37. Whatever the term employed, this Court must equitably allocate the responsibility for the injury or loss resulting from the unseaworthiness of

11. The Court notes that Phelps' second amended claim against ARTCO does *not* allege unseaworthiness by ARTCO. ACBL however, has an unsea worthiness claim against ARTCO. That claim fails for the reasons stated herein.

12. These are gross amounts, before the Court has accounted for Phelps' share of responsibility.

the vessel. *Id., citing Chotin Transp., Inc. v. United States,* 819 F.2d 1342, 1353 n. 1 (6th Cir.), *cert. denied,* 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 371 (1987). *See also Garland v. Material Service Corp.,* 291 F.2d 861, 864 (7th Cir.1961) **(affirming trial court's use of contributory negligence instruction in case involving claims of negligence *and* unseaworthiness);** *Knight v. Alaska Trawl Fisheries, Inc.,* 154 F.3d 1042, 1047 (9th Cir.1998) **("Maritime law has also long applied the rule of comparative fault in a seaman's unseaworthiness action against a shipowner.").** Thus, Phelps' comparative responsibility must be factored in to reduce his award for damages on the unseaworthiness claim.

50. Phelps total damages against ACBL are $465,855. The percentage of responsibility attributable to Phelps (his comparative negligence or causation) is 25%. Thus, **Phelps is entitled to recover from ACBL on his unseaworthiness and Jones Act claims $349,391.25.** But the Court must assess one other potential offset to these damages—the effect of the maintenance and cure already paid by ACBL to Phelps.

51. A seaman's right to maintenance and cure is implied in the employment contract between seaman and shipowner. *Brister,* 946 F.2d at 360. The right to maintenance and cure is not predicated on the fault or the negligence of the shipowner. *Id., quoting Aguilar v. Standard Oil of New Jersey,* 318 U.S. 724, 730, 63 S.Ct. 930, 87 L.Ed. 1107 (1943).[13] Thus, a vessel owner is "almost automatically liable for the cost of medical treatment and basic living expenses when a seaman in its employ is injured." *Id.*

52. "When it appears that a seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved." *Cella,* 998 F.2d at 430, *citing Pelotto v. L & N Towing Co.,* 604 F.2d 396, 400 (5th Cir.1979). As noted in the Court's findings of fact, Phelps reached maximum cure on April 8, 1998, and ACBL paid him $26,126.38 in cure.

53. Although an award for maintenance and cure is independent of recovery allowed under Jones Act and unseaworthiness claims, "a seaman clearly can receive only one recovery for his medical expenses." *Brister,* 946 F.2d at 361. *Id.* Since the element of past medical expenses "is inherent in each of the two types of recoveries [negligence and unseaworthiness], there must not be a duplication in the final award ... by a Judge sitting in admiralty." *Id.*

54. Here, all of Phelps' medical bills already have been paid by ACBL. ACBL has satisfied its cure obligation, so the Court does not award Phelps damages for past medical expenses.

55. Maintenance is *not* considered a substitute for lost wages. *See Colburn v. Bunge Towing, Inc.,* 883 F.2d 372, 378 (5th Cir.1989) **(recognizing that while medical expenses included in damage award are not allowed to duplicate cure paid by employer, award for lost earnings does *not* duplicate maintenance paid by employer).**

56. ACBL paid Phelps $5,320 in maintenance. Phelps' recovery of lost in-

---

13. The Seventh Circuit has explained: "Historically the duty of maintenance and cure derives from a seaman's dependence on his ship.... Aside from gross misconduct or insubordination, what the seaman is doing and why and how he sustains injury does not affect his right to maintenance and cure, however decisive it may be as to claims for indemnity or for damages for negligence." *Atlass,* 350 F.2d at 596.

come/wages need not be reduced by this amount.

57. Under the Jones Act, recovery of prejudgment interest is not permitted. *Colburn,* 883 F.2d at 378. However, as a general rule, prejudgment interest may be awarded in *admiralty* cases—not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled. *Brister,* 946 F.2d at 362. "This general rule is limited by the proposition that a seaman may receive prejudgment interest for past but not future damages." *Id.*

58. Phelps is entitled to prejudgment interest on his unseaworthiness claim against ACBL—the damages for which, after being reduced by the amount of Phelps' comparative causation, total $349,391.25. That amount must be further reduced by $85,000 (the portion of the unseaworthiness damages awarded for disability and disfigurement). Thus, **Phelps may recover prejudgment interest on $264,391.25.**

59. The prime rate is the "benchmark for prejudgment interest unless either there is a statutorily defined rate or the district court engages in 'refined rate-setting' directed at determining a more accurate market rate for interest." *First Nat'l Bank of Chicago v. Standard Bank & Trust,* 172 F.3d 472, 480 (7th Cir.1999), *citing Cement Division, National Gypsum Co. v. City of Milwaukee,* 144 F.3d 1111, 1114(7th Cir.1998); *In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1332 (7th Cir.1992). The circumstances of this case

do not warrant refined rate-setting, and the prime rate shall be used.

60. Interest should be calculated from the date of the accident (July 17, 1997) averaging the prime rate for the years in question, until August 2001, when judgment will be entered.[14]

61. Counsel for Phelps and counsel for ACBL shall make the necessary calculations to determine the appropriate rate for prejudgment interest and shall submit those calculations in memo form to the Court on or before **August 13, 2001.**

62. In its amended counterclaim, ARTCO prays for "a reasonable attorneys' fee from ACBL ... for attorneys' fees incurred ... to defend the claim of Charles Phelps for personal injury" (Doc. 26, p. 3).[15] The Court **DIRECTS** counsel for ARTCO and ACBL to file memoranda (no longer than seven pages, excluding exhibits and supporting materials) supporting and opposing the award of attorneys' fees to ARTCO. ARTCO's memorandum must be filed on or before **August 8, 2001.** ACBL's memorandum must be filed on or before **August 15, 2001.** Each memorandum should be accompanied by a proposed Order.

### IV. *Conclusion*

On ARTCO's complaint/petition against Phelps and ACBL (*Doc.1*), the Clerk of Court shall enter judgment in favor of ARTCO and against Phelps and ACBL.

On Phelps' second amended claim against ARTCO (*Doc.64*), the Clerk of

---

**14.** Judgment will not be entered at this time, as the Court has not yet ruled on the attorneys' fee issue, which—as is further described below—counsel have until mid-August to brief. The Court's best estimate of the date judgment will be entered is Friday, August 24, 2001 (assuming the parties timely file their briefs on attorneys' fees and their calculations on prejudgment interest).

**15.** Neither Phelps nor ACBL requested attorneys' fees in their claims filed in this Court. *See* ACBL's 3–13–00 claim against ARTCO (Doc. 9), Phelps' 7–9–01 second amended claim against ARTCO (Doc. 64), and Phelps' 7–9–01 amended cross-claim against ACBL (Doc. 65).

Court shall enter judgment in favor of ARTCO and against Phelps.

On Phelps' amended cross-claim against ACBL (*Doc.65*), which includes Phelps' Jones Act and unseaworthiness claims, the Clerk of Court shall enter judgment in favor of Phelps and against ACBL in the total amount of **$349,391.25.**

On ARTCO's amended counterclaim against ACBL (*Doc.26*), the Court has not found ARTCO liable for any damages to Phelps, so ARTCO's claims for contribution and indemnity are moot. However, ARTCO also seeks attorneys' fees from ACBL for the costs of defending Phelps' claims. The Court **RESERVES RULING** on that issue at this time.

On ACBL's claim against ARTCO (*Doc.9*), the Clerk of Court shall enter judgment in favor of ARTCO and against ACBL.

Because the Court has not yet resolved the attorneys' fees issue raised by ARTCO's counterclaim against ACBL (Doc. 26) and has not yet determined the precise amount of prejudgment interest to which Phelps is entitled on his amended cross-claim against ACBL (Doc. 65), the Clerk of Court shall **NOT ENTER JUDGMENT** at this time.

Rather, the Court will resolve the attorneys' fees and prejudgment interest issues in mid-August, following receipt of counsel's briefs on these issues. Then the Clerk of Court will enter a single judgment reflecting the resolution of all the claims raised herein. Any post-trial motions should not be filed until *after* the Clerk enters judgment. *See* Fed. R. Civ. Proc. 52(b) (**"On a party's motion filed no later than 10 days *after* entry of judgment. . . ."**).

Having provided written findings and conclusions, the Court CANCELS the hearing set for 2:30 p.m. on Thursday, August 2, 2001, at which the Court had planned to orally announce its findings and conclusions.

**IT IS SO ORDERED.**